643 F.2d 353
 25 Fair Empl.Prac.Cas. 849,
25 Empl. Prac. Dec. P 31,768
Michael E. SPIESS, Jack K. Hardy and Benjamin F. Rountree,
Plaintiffs-Appellees,
v.
C. ITOH & COMPANY (AMERICA), INC., Defendant-Appellant.
 No. 79-2382.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A
 April 24, 1981.
 Fulbright & Jaworski, Joe P. Martin, Neil Martin, Nancy Morrison O'Connor, Houston, Tex., for defendant-appellant.
 Foreman, Dyess, Prewett, Rosenberg & Henderson, Edward John O'Neill, Jr., Charles E. Humphrey, Jr., Houston, Tex., for plaintiffs-appellees.
 Lutz Alexander Prager, Marcia Beth Ruskin, E. E. O. C., Washington, D. C., for amicus curiae.
 Appeal from the United States District Court for the Southern District of Texas.
 Before COLEMAN, CHARLES CLARK and REAVLEY, Circuit Judges.
 CHARLES CLARK, Circuit Judge:
 
 
 1
 This interlocutory appeal presents an important issue of first impression in this circuit. C. Itoh & Company (America), a New York corporation wholly owned by a Japanese parent corporation, argues that a 1953 treaty between the United States and Japan permits it to hire only Japanese citizens for managerial and technical positions, in spite of American laws prohibiting discrimination on the basis of national origin. We hold that the treaty affords American subsidiaries of Japanese corporations the limited right to discriminate in favor of Japanese nationals in filling these positions.
 
 I.
 
 2
 Michael E. Spiess and other American employees of C. Itoh-America filed a class action under Title VII of the Civil Rights Act and 42 U.S.C. section 1981. The complaint charged that the company had discriminated against its American employees by making managerial promotions and other benefits available only to Japanese citizens. C. Itoh-America filed a motion to dismiss, asserting that the Treaty of Friendship, Commerce and Navigation between the United States and Japan, April 2, 1953, 4 U.S.T. 2063, T.I.A.S. No. 2863, precluded the plaintiffs' suit. Article VIII(1) of the Treaty provides that
 
 
 3
 companies of either Party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents and other specialists of their choice.
 
 
 4
 C. Itoh-America argued that the language permitting companies to engage executive personnel "of their choice" cloaks the company with absolute immunity from American employment discrimination laws as to these positions.
 
 
 5
 The trial court denied C. Itoh-America's motion to dismiss, relying primarily on article XXII(3) of the Treaty. Under article XXII(3),
 
 
 6
 (c)ompanies constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other Party.
 
 
 7
 The trial court reasoned that C. Itoh-America, a New York corporation, had been "constituted" under the laws of the United States. As a result, the court concluded that C. Itoh-America was a "company of the United States" under the plain meaning of article XXII(3), even though it was wholly owned by C. Itoh & Company, Ltd., a Japanese corporation. Because C. Itoh-America, in this view, was not a company of one party operating within the territory of the other, the trial court ruled that it could not assert the article VIII(1) right to choose executive personnel of its choice. See Spiess v. C. Itoh & Co. (America), Inc., 469 F.Supp. 1, 6 (S.D.Tex.1979). Upon a motion by C. Itoh-America, however, the district court permitted the company to take an interlocutory appeal. The following question was certified to this court under 28 U.S.C. section 1292(b):
 
 
 8
 Does the 1953 Treaty of Friendship, Commerce and Navigation between the United States and Japan provide American subsidiaries of Japanese corporations with the absolute right to hire managerial, professional and other specialized personnel of their choice, irrespective of American law proscribing racial discrimination in employment?
 
 II.
 
 9
 The Japanese Treaty is one in a long line of Friendship, Commerce and Navigation (FCN) treaties negotiated on a bilateral basis between the United States and other countries. Since the negotiation of the first FCN treaty with France in 1778, American diplomats have used the FCN device to establish the ground rules by which private commerce between American citizens and citizens of other countries is regulated. See generally Walker, Modern Treaties of Friendship, Commerce and Navigation, 42 Minn.L.Rev. 805, 806 (1958) (hereinafter cited as Modern Treaties). The FCN format is a flexible one, and it has been used at different times to serve different foreign policy goals. The central theme of the FCN treaty, however, has remained. An FCN treaty is the medium through which two nations provide "for the rights of each country's citizens, their property and other interests, in the territories of the other, and for the rules mutually to govern their trade and shipping." Walker, Treaties for the Encouragement and Protection of Foreign Investment: Present United States Practice, 5 Am.J.Comp.L. 229, 230-31 (1956) (hereinafter cited as United States Practice).
 
 
 10
 The FCN treaties, including the Japanese Treaty, are self-executing treaties, that is, they are binding domestic law of their own accord, without the need for implementing legislation. See Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd., 494 F.Supp. 1263, 1266 (E.D.Pa.1980). Such treaties are "the supreme law of the land," and supersede inconsistent state law. U.S.Const. art. VI, cl. II; United States v. Pink, 315 U.S. 203, 230, 62 S.Ct. 552, 565-66, 86 L.Ed. 796, 817-818 (1942); De Tenorio v. McGowan, 510 F.2d 92, 95 (5th Cir. 1975). See also Oregon-Pacific Forest Products Corp. v. Welsh Panel Co., 248 F.Supp. 903, 910 (D.Or.1965) (Japanese Treaty is "supreme law of the land"). Even federal statutes "ought never to be construed to violate the law of nations if any other possible construction remains." The Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208, 226 (1804), quoted in McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 21, 83 S.Ct. 671, 678, 9 L.Ed.2d 547, 555 (1963). Only when Congress clearly intends to depart from the obligations of a treaty will inconsistent federal legislation govern. Id. Thus, unless federal civil rights laws reflect an affirmative disavowal of the rights provided by the Treaty, it is our duty to implement the treaty rights.
 
 III.
 
 11
 The district court held that C. Itoh-America was an American company for the purposes of the Treaty, and thus could not assert the article VIII rights extended to Japanese corporations operating in this country. In the trial court's view, "(a)rticle XXII(3) unequivocally states that for the purpose of the Treaty the nationality of the corporation is determined by the place of incorporation." Spiess v. C. Itoh & Co. (America), Inc., 469 F.Supp. 1, 6 (S.D.Tex.1979). We reject this construction of article XXII(3).
 
 
 12
 The district court's reading of article XXII(3) is compatible with the text of the Treaty, but it fails to account for the unique nature of an international agreement. Unlike domestic legislation, treaties must create a common ground between differing cultures before the rights of the parties can be defined. The negotiating history of the Treaty makes clear that article XXII(3) was designed for this purpose. A contemporaneous memorandum prepared by State Department negotiators demonstrates that the provision was intended, not to determine which forms of corporate organization were entitled to assert Treaty rights, but to ensure that unfamiliar organizations would be recognized as "companies" by the legal institutions of the respective countries. The memorandum noted the following colloquy:
 
 
 13
 Mr. Nagai (a Japanese negotiator) then asked what "juridical status" meant, and inquired whether the recognition of juridical status mentioned in paragraph three (of article XXII) meant anything more than the recognition of the existence of a juridical person.
 
 
 14
 Mr. Bassin (the American negotiator) replied that "juridical status" meant "legal status," the legal position of an organization in, or with respect to, the rest of the community. The recognition mentioned in the second sentence of paragraph three, he added, meant merely the recognition by either Party of the existence and legal status of juridical persons organized under the laws of the other Party.
 
 
 15
 Dispatch No. 13, Office of the United States Political Advisor for Japan, dated April 8, 1952, at 5 (hereinafter referred to as Bassin Memorandum).[1]
 
 
 16
 FCN authority Herman Walker[2] has expressed a similar understanding of article XXII(3). In a 1956 article, Walker described the "distinct problems" encountered in defining "company" broadly enough to accommodate the varied purposes of an FCN treaty. Walker, Provisions on Companies in United States Commercial Treaties, 50 Am.J. Int'l L. 373, 380 (1956) (hereinafter cited as Provisions on Companies). Walker noted that "(t)he standard definition is exemplified by Art. XXII, par. 3, of the 1953 Japan treaty." Id. at 380 n.34. In this definition, Walker explained,
 
 
 17
 (a) "company" is defined simply and broadly to mean ... any "artificial" person acknowledged by its creator, as distinguished from a natural person, whether or not for pecuniary profit. Every association meeting this simple test of valid existence must be accounted by the other party a company of the party of its creation, and have its juridical status recognized without any reservation for the laws of the forum.
 
 
 18
 Id. at 380-81. Walker also emphasized that there was a
 
 
 19
 clear distinction maintained in the treaties between the so-called "civil" and "functional" capacities of companies. The recognition of status and nationality does not of itself create substantive rights; these are dealt with elsewhere on their own merits. Thus the acknowledgment of a fact the existence and legitimate paternity of an association is not confused with problems associated with the functional rights and activities of alien-bred associations.
 
 
 20
 Id. at 383. Thus, both the negotiators on location in Tokyo and the architect of the modern FCN treaty agree that article XXII(3) merely guarantees legal recognition to diverse forms of legal entities and does not determine which of those entities can assert treaty rights.
 
 
 21
 The Department of State has remained faithful to this interpretation of the Treaty. In a 1976 cable from Secretary Kissinger, the Department informed the American embassy in Tokyo that
 
 
 22
 all that para 3 (of article XXII) is meant to accomplish is the establishment of a procedural test for the determination of the status of an association, i. e., whether or not to recognize it as a "company" for purposes of the treaty. Once such recognition is granted, the functional rights accorded to companies under the FCN (for example, the Article VII rights of a company to establish and control subsidiaries) then accrue.
 
 
 23
 Airgram from Secretary of State Kissinger to American embassy in Tokyo, No. A-105, dated Jan. 9, 1976. A subsequent opinion from a State Department legal advisor reaches the same conclusion. Letter from Lee R. Marks to Abner W. Sibal (October 17, 1978). Thus, the consistent view of the State Department has been that American subsidiaries of Japanese corporations are entitled to the full protection of the Treaty.[3] This view weighs heavily in our analysis.[4] See Kolovrat v. Oregon, 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218, 223 (1961).
 
 
 24
 Finally, we think that the district court's interpretation of article XXII(3) would create an unreasonable distinction between treatment of American subsidiaries of Japanese corporations on the one hand, and branches of Japanese corporations on the other. According to the district court, a company is considered a "company of Japan" for purposes of the Treaty only if it is incorporated in Japan. Under this analysis, American-incorporated subsidiaries of Japanese corporations would be entitled to Treaty protection only when they are specifically mentioned, and would not fall within the "companies of either Party" formula used throughout the Treaty. As the Second Circuit recently has observed, this would create a "crazyquilt pattern" in which branches of Japanese corporations would enjoy broad rights under the Treaty, while subsidiaries would be entitled only to minor protection. See Avigliano v. Sumitomo Shoji America, Inc., 638 F.2d 552, 556 (2d Cir.1981). In view of article VII's guarantee that companies shall be allowed to conduct business activities "through the medium of any form of lawful juridical entity," including both branches and locally organized subsidiaries, we agree that "(i) t is illogical to infer that the drafters of the Treaty intended to make such a dramatic distinction between forms of business operation." Avigliano, supra, at 556; cf. also United States Practice, supra, at 233 (branches and local subsidiaries treated alike in Treaty).
 
 
 25
 We are aware that other courts have disagreed with our conclusion. The district court relied on United States v. R.P. Oldham Co., 152 F.Supp. 818, 823 (N.D.Cal.1957), which held that article XXII(3) precluded American subsidiaries from asserting Treaty rights. Cf. also, Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd., 494 F.Supp. 1263, 1265 n. 4 (E.D.Pa.1980) (standing issue raised but not decided). While their analysis may be supported by the literal text of article XXII(3), the clearly established intent of the parties to the treaty overrides such literalism. Accordingly, we hold that C. Itoh-America, a New York corporation wholly owned by a Japanese parent, may assert all rights extended to "companies of either Party" by the Japanese treaty.[5]
 
 IV.
 
 26
 The parties also disagree as to the scope of the rights established by the Treaty. According to C. Itoh-America, article VIII(1) provides the company with an absolute exemption from American employment discrimination laws. On its face, article VIII(1) seems to confirm this view. It provides that "companies of either Party shall be permitted to engage ... executive personnel ... of their choice." We are mindful, however, especially after our treatment of article XXII(3), that the apparent plain meaning of a treaty provision may not always reflect the provision's actual purpose. Spiess argues that a literal reading of the "of their choice" provision would fly in the face of the Treaty's general policy. In his view, article VIII(1) provides only national treatment to Japanese corporations. After a thorough examination of the structure of the Treaty and the setting in which it was negotiated, we hold that article VIII(1) does exempt C. Itoh-America from domestic employment discrimination laws to the extent of permitting discrimination in favor of Japanese citizens in employment for executive and technical positions.
 
 A.
 
 27
 The Japanese Treaty belongs to a group of sixteen treaties negotiated in the years immediately following World War II. These treaties share the salient characteristics of FCN treaties, but they reflect several innovations designed to adapt the FCN device to the realities of modern international commerce. Thus, these treaties extended explicit protection to corporations, as well as to natural persons. See Provisions on Companies, supra at 380. The animating purpose of American treaties of this period was to provide a stable environment for private international investment. See United States Practice, supra, at 231.
 
 
 28
 Under the post-war treaties, the rights of foreign nationals operating in the host country were measured, for the most part, by two so-called "contingent standards." Modern Treaties, supra, at 810-11. Under the first standard, foreign nationals were guaranteed "national treatment," that is, the same treatment afforded to native citizens. The national treatment standard was viewed as a progressive one by American diplomats, and negotiators sought, whenever possible, to use it as the measure of a foreigner's rights in the host country. Id. The Japanese Treaty reflects this effort, and guarantees its signatories "national treatment with respect to engaging in all types of commercial, industrial, financial and other business activities." Treaty, art. VII(1); see also art. III (national treatment in pension and social security laws); art. IX(1)(a) (national treatment in leasing, occupying, and using property).
 
 
 29
 The nationalistic fervor of the post-war era, however, prevented universal application of the national treatment rule. Thus, in sensitive areas where the host country could not ignore the divided loyalties of foreigners areas such as shipbuilding, or domestic air transport a second standard was used. Under this standard, foreign nationals were guaranteed "most favored nation" treatment, or treatment as favorable as that enjoyed by the citizens of any foreign nation. See United States Practice, supra, at 236. Thus, article VII(2) of the Japanese Treaty provides most favored nation treatment for foreigners who seek to operate a public utility in the host country, or who would engage in shipbuilding, air or water transportation, deposit banking, or exploitation of land and natural resources. See also art. XIII (most favored nation treatment for foreign travelers entering and leaving country); art. XIV(5) (most favored nation treatment in matters of export and import).[6]
 
 
 30
 Although the two contingent standards were widely used in the post-war FCN treaties, they were not the exclusive means by which the rights of foreigners were protected. As Walker has observed, there was also "a certain margin for the play of non-contingent standards, or 'absolute' rules in the formulation of treaty provisions." Modern Treaties, supra, at 811. Absolute rules were intended to protect vital rights and privileges of foreign nationals in any situation, whether or not a host government provided the same rights to the indigenous population. Id. at 823. According to Walker, foreign nationals were to receive "not only equal protection, but also a certain minimum degree of protection, as under international law, regardless of a Government's possible lapses with respect to its own citizens." United States Practice, supra, at 232. The use of absolute rules is well illustrated in the Japanese Treaty. Article I permits foreign nationals to enter and leave the host country, and provides for rights of free travel, liberty of conscience, religious freedom, and other personal rights. By the same token, article II(2) provides for notification of an alien's consulate in the event he is arrested, article VI(3) guarantees the payment of just compensation for expropriated property, and article XX(a) allows nationals of one party freedom of transit by the most convenient route through the territory of the other party.
 
 B.
 
 31
 Spiess argues that the "of their choice" provision of article VIII(1) should be read to grant national treatment to companies of either party. In his view, this reading would comport well with the Treaty's emphasis on national treatment; he finds it incongruous that a treaty providing for equal treatment of all parties could be used to provide special privileges to foreign nationals in the host country. This view recently was adopted by the Second Circuit in the Avigliano case. See Avigliano v. Sumitomo Shoji America, Inc., supra, at 559. A district court in the Second Circuit had previously applied the same theory to the Danish FCN treaty, which includes a similar provision. See Linskey v. Heidelberg Eastern, Inc., 470 F.Supp. 1181, 1185-86 (E.D.N.Y.1979).
 
 
 32
 We agree that an overriding goal of the Treaty negotiators was to provide national treatment to foreign businesses operating in the host country. However, national treatment was not the Treaty's exclusive measure of the rights to be accorded to foreign nationals. It is apparent that article VIII(1)'s "of their choice" provision was intended, not to guarantee national treatment, but to create an absolute rule permitting foreign nationals to control their overseas investments. As we noted above, absolute rules played a significant role in defining the rights of parties. The language of article VIII(1) makes clear that the "of their choice" provision was designed to establish such a rule. Use of the phrase "of their choice" does not express the requirement that the parties are limited to national treatment. This is accentuated by the fact that the phrase "nationals of either Party shall be accorded national treatment" appears repeatedly in other provisions of the Treaty. Considering the Treaty as a whole, the only reasonable interpretation is that article VIII(1) means exactly what it says: Companies have a right to decide which executives and technicians will manage their investment in the host country, without regard to host country laws.
 
 
 33
 Our understanding of article VIII(1) is reinforced by Walker and the negotiating history of the Treaty. In discussing immigration rights under the FCN treaties, Walker notes that,
 
 
 34
 firm rights are provided for the entry and indefinite sojourn of international traders and principal investors. Though equal provision for subordinate investor-enterprise employees is not yet possible owing to lack of statutory authority, such personnel is to an extent provided for, in that management is assured freedom of choice in the engaging of essential executive and technical employees in general, regardless of their nationality, without legal interference from "percentile" restrictions and the like.
 
 
 35
 United States Practice, supra, at 234. In a footnote, Walker identifies article VIII(1) as an example of this kind of provision. Id. at 234 n. 15. Walker also explains that "(i)n the matter of employment, provisions have been developed technically going beyond national treatment, to prevent the imposition of ultra-nationalistic policies with respect to essential executive and technical personnel." Provisions on Companies, supra, at 386. Again, Walker identifies the Japanese Treaty as an example of this principle, and continues in a footnote to point out that article VIII(1) allows "free choice" in the selection of specialized personnel. Id. at 386 n. 62.
 
 
 36
 Despite the clear evidence that article VIII(1) was intended to go beyond national treatment, Spiess insists that, if it is broader, it does not go far enough beyond national treatment to immunize C. Itoh-America from American employment discrimination laws. According to Spiess, if the "of their choice" provision goes beyond national treatment, it does so only to protect Japanese companies from state laws that restrict the activities of aliens employed in the United States. In this view, article VIII(1) would protect C. Itoh-America from "ultranationalistic" state laws discriminating against Japanese citizens, but not from federal laws forbidding the company itself to discriminate. In much the same vein, the Second Circuit held that the Treaty could be interpreted to be consistent with the nation's employment discrimination laws. See Avigliano, supra, at 559. Under this theory, the Title VII exemption for bona fide occupational qualification (bfoq) requirements is broad enough to encompass any rights that Japanese corporations legitimately could assert under the Treaty. The Equal Employment Opportunity Commission also raised this possibility in an amicus curiae brief submitted in this case.
 
 
 37
 Although the Treaty and commentary offer some support for this point of view, the argument misapprehends the nature of a right created in the course of international bargaining. From the American perspective, the Japanese Treaty was "intended primarily to facilitate American private-sector investment in foreign nations." Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd., 494 F.Supp. 1263, 1267 (E.D.Pa.1980); Avigliano, supra, at 556; see United States Practice, supra, at 231. The article VIII(1) right to free choice of technical and managerial personnel sought to ensure that the American businessman's investment in the host country would remain within his control. The legislative history cited to us by C. Itoh-America demonstrates that the Senate, in consenting to ratification of the Treaty, was concerned about the right of American companies to use American personnel to control their investments in Japan. See Commercial Treaties Treaties of Friendship, Commerce & Navigation, with Israel, Ethiopia, Italy, Denmark, Greece, Finland, Germany, and Japan: Hearings before the Subcom. of the Senate Comm. on Foreign Relations, 83d Cong., 1st Sess. 2, 3, 6-9 (1953). It is self-evident that this same goal of American negotiators in formulating article VIII(1) was the goal of Japanese negotiators who sought it to protect Japanese companies operating in the United States.
 
 
 38
 Clearly, article VIII(1) provides some right to Japanese companies to manage their own affairs.[7] It is irrelevant whether the source of potential interference with that right is state legislation characterized as "ultranationalistic" or a federal statute labeled "progressive." The right of Japanese companies to choose essential personnel is a right to maintain Japanese control of the overseas investment. To make this right subject to Title VII's bfoq requirements, or to interpret it to override only state law, would render its inclusion in the Treaty virtually meaningless. Thus, we hold that the article VIII(1) "of their choice" provision permits Japanese companies to discriminate in favor of their fellow citizens.[8]
 
 
 39
 Title VII was enacted after the Treaty, and thus might be thought to nullify inconsistent principles of domestic law created as a by-product of the Treaty. The general rule is that subsequent federal legislation will invalidate treaty obligations if the congressional intent to do so is clearly expressed.[9] See, e. g., McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 21, 83 S.Ct. 671, 678, 9 L.Ed.2d 547, 555 (1963). No evidence suggests that Congress intended to repudiate article VIII(1) when it enacted Title VII. Domestic employment discrimination laws occupy a high priority on the nation's agenda, and courts often resolve statutory conflicts in their favor. In this case, however, resolving doubts in favor of Title VII would go beyond the judicial sphere of interpretation. In the absence of congressional guidance, we decline to abrogate the American government's solemn undertaking with respect to a foreign nation.
 
 
 40
 Spiess raises an additional argument which merits attention. He contends that any right to discriminate afforded by the Treaty is contrary to the Charter of the United Nations and thus is invalid because it is in conflict with higher law. Spiess points out that article 55 of the Charter encourages "universal respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race, sex, language or religion." Spiess argues that this language prohibits the United States and Japan from agreeing to allow each other's businesses to hire fellow citizens when operating in the other country.
 
 
 41
 We note initially that the national origin distinction at issue in this case does not fall within the enumerated categories of "race, sex, language or religion." In any event, the Charter of the United Nations, although adopted by the United States, is not a self-executing international obligation. Hitai v. Immigration and Naturalization Service, 343 F.2d 466, 468 (2d Cir. 1965); Davis v. District Director, Immigration and Naturalization Service, 481 F.Supp. 1178, 1183 n. 7 (D.D.C.1979). Spiess argues that even though the Charter is not self-executing, Title VII was enacted to implement its provisions, and thus partakes of the lex superior characteristics of the Charter. We do not agree. Title VII is legislation independent of the Charter. It was enacted in the domestic interest of the nation. It thus possesses no overriding authority and does not, of its own accord, invalidate antecedent treaty obligations of the United States.
 
 V.
 
 42
 In summary, we hold that C. Itoh-America may assert article VIII(1) rights under the Treaty, and that those rights permit it to hire only Japanese personnel for executive and technical positions. The opinion of the district court is reversed, and the case is remanded with directions to dismiss.
 
 
 43
 REVERSED AND REMANDED WITH DIRECTIONS.
 
 REAVLEY, Circuit Judge, dissenting:
 
 44
 The majority opinion concludes that C. Itoh-America is exempt from the requirements of Title VII of the Civil Rights Act of 1964 because article VIII(1) of the FCN Treaty between Japan and the United States grants to "companies of (Japan)" the right to hire executive and technical personnel "of their choice." Obviously, this conclusion depends upon the finding that a company incorporated in the United States and doing business here is nevertheless a "company of Japan" merely because it is owned by a Japanese parent corporation. In my view, the drafters of the Treaty created in article XXII(3) a precise definition for the term "company of (Japan)," clearly stating that a corporation has the nationality of its place of incorporation. That interpretation of the article is consistent with the other provisions of the Treaty, while the majority view creates substantial inconsistencies and redundancies. Furthermore, secondary sources of the highest authority support the conclusion that C. Itoh-America is a company of the United States and not of Japan.
 
 I. The Article XXII(3) Definition
 
 45
 The drafters of the Treaty wanted to distribute the benefits of commercial exchanges between the United States and Japan broadly and expediently. In choosing the terminology of the document that would achieve this end, they faced the historical and cultural fact that Japan and the United States had developed widely diverse forms of commercial organization.[1] The drafters thus chose to avoid problems of semantics by adopting only two basic terms of art to describe the commercial entities indigenous to each nation: "nationals of either Party" and "companies of either Party." The term "nationals" obviously covers individual businesspersons and entrepreneurs having United States or Japanese citizenship. The term "companies" is specifically defined in article XXII(3) of the Treaty to include every form of business association: "As used in the present Treaty, the term 'companies' means corporations, partnerships, companies and other associations, whether or not with limited liability and whether or not for pecuniary profit." Article XXII(3). The Treaty also recognized a third form of business entity that is likely to come into existence when, for example, a national or company of Japan[2] enters the United States under the broad commercial and legal rights established by the Treaty. That third entity is the individual proprietorship or company (in the broad Treaty sense) that is formed in the United States, does business here, and yet is owned and controlled, in whole or part, by a national or company of Japan. The Treaty's term of art for this third form of international commercial activity is "enterprises controlled by nationals and companies of (Japan)."[3] The Treaty generally distributes rights among private parties by specific reference to one or more of these three forms of commercial entities.
 
 
 46
 But the term "company of (Japan)" is not completely defined merely by saying that every form of business association shall be deemed a company under the terms of the Treaty. Thus article XXII(3) continues in a second sentence to specify, first, the test of when a corporation may claim nationality from either Japan or the United States and, second, when a juridical entity entitled to be called a "company" comes into existence: "Companies constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other Party" (emphasis added).
 
 
 47
 The first purpose of this sentence, to define a test of corporate nationality, is addressed by the simple phrase placed in italics. The second purpose, to define the creation of a juridical entity that must be recognized as a "company", is addressed by the remainder of the sentence after the italicized phrase. The two purposes become conceptually muddled, especially in some of the documents cited by the majority, only because they coincide in one event: when either nation creates a company under its own laws, that company has the nationality of the creating nation and must be recognized as a juridical entity by the other nation.
 
 
 48
 The primary flaw in the majority's analysis is that it ignores the existence of the phrase "shall be deemed companies thereof" in article XXII(3). The majority argues that the only purpose of this article is to determine when the juridical entity designated as a "company" exists. I agree that is one purpose of the article, but the phrase "shall be deemed companies thereof" is totally unnecessary to that end. What is the meaning of this phrase if not to determine corporate nationality for the purposes of the Treaty? If the majority rejects the plain meaning of this phrase, it has three initial problems. The first is to say what this phrase does mean. The second is to explain how the drafters could fail to specify an answer to a question as important as the determination of corporate nationality,[4] for the issue is certainly addressed nowhere else in the Treaty or Protocol. The third problem is that the majority must justify its own conclusion that the nationality of a corporation is to be determined by the nationality of some unspecified percentage of shareholders,[5] because this test is only one of several other possibilities, and the majority cites no authority for its own choice. For instance, an international corporation could claim nationality based upon place of incorporation, nationality of shareholders, place of principal office, place of principal assets, derivation of income, or any combination thereof. International law has for many years resolved this complex question with the principle that an international corporation has the nationality of its place of incorporation.[6] Article XXII(3) certainly appears to follow this well- established principle, and if the majority rejects that view, it must justify its own choice.
 
 
 49
 II. Analysis of the Treaty Structure and Articles
 
 
 50
 Anyone doubting that article XXII(3) was intended to specify that a corporation has the nationality of its place of incorporation should examine the Treaty structure and the internal consistency of the other articles. The results of such an analysis confirm that article XXII(3) means exactly what it says.
 
 A. The Basic Terms of Art
 
 51
 To begin with the basic semantics of the Treaty, the drafters consistently used three terms of art to allocate benefits among private parties, "nationals of (Japan or the United States)," "companies of (Japan or the United States)," and "enterprises controlled by such nationals or companies." The very creation of these three terms of art is a strong indication that the drafters viewed each as representing a distinct entity. Yet under the majority view a company incorporated in the United States but controlled by a Japanese national or company (which I will refer to as a "Japanese-controlled American company") is already a "company of Japan." That view equates the latter two terms, deprives the last term of all meaning and purpose, and creates the additional confusion and redundancy that I will discuss below.
 
 
 52
 B. Provisions Based on the Place of Incorporation Test
 
 
 53
 Two articles of the Treaty are clearly based on the assumption that a company has the nationality of its place of incorporation. The first is article VII(1), which the State Department identified as the "heart of the treaty." Airgram from the State Department to the American embassy in Tokyo, No. A-453, dated January 7, 1952. The first sentence of that article says,
 
 
 54
 "Nationals and companies of (Japan) shall be accorded national treatment with respect to engaging in all types of commercial, industrial, financial, and other business activities within the territories of the (United States), whether directly or by agent or through the medium of any form of lawful juridical entity."
 
 
 55
 The final sentence says,
 
 
 56
 "Moreover, enterprises which (nationals and companies of Japan) control, whether in the form of individual proprietorships, companies, or otherwise shall, in all that relates to the conduct of the activities thereof, be accorded treatment no less favorable than that accorded like enterprises controlled by nationals and companies of (the United States)."
 
 
 57
 There is a subtle difference between the degree of rights conferred by these two sentences. The first sentence says that nationals and companies of Japan doing business within the United States are entitled to equality of treatment with nationals and companies of the United States, expressed in the term of art common to such treaties, "national treatment." The second sentence, however, does not confer simple "national treatment" on Japanese-controlled American companies, but a narrower right: equality of treatment with subsidiary enterprises controlled by nationals and companies of the United States. I will call this "national subsidiary treatment." This specific grant of a narrower right to Japanese-controlled American corporations makes sense only if such a corporation is a company of the United States. If it were already a company of Japan, it would have gained full "national treatment" from the first sentence of article VII(1), which would defeat the subsequent grant of a narrower right.
 
 
 58
 Article XXI(1)(e) of the Treaty also indicates that the nationality of a corporation is normally to be determined by its place of incorporation. This article provides as follows:
 
 
 59
 The present Treaty shall not preclude the application of measures ... denying to any company in the ownership or direction of which nationals of any third country or countries have directly or indirectly the controlling interest, the advantages of the present Treaty, except with respect to recognition of juridical status and with respect to access to courts of justice and to administrative tribunals and agencies.
 
 
 60
 I read this to mean that, although a company incorporated in Japan may normally claim all the privileges of a "company of Japan" while doing business in the United States, if the United States discovers that nationals of a third country own the Japanese company, the United States may deny the benefits of the Treaty to such company, with the listed exceptions. For instance, if a company incorporated in Japan is in fact owned and controlled by North Korea, the United States may "pierce the corporate veil" and prevent North Korea from gaining broad commercial rights within the United States by such devious means. If the majority were correct in saying that a corporation under the Treaty has the nationality of its controlling shareholders, a Japanese company controlled by nationals of North Korea would not be a company of Japan to begin with, and there would be no need for this explicit and exceptional reservation of authority by both countries.
 
 
 61
 C. Specific Inclusions of Controlled Enterprises
 
 
 62
 Under normal principles of statutory interpretation, if a party or item is specifically enumerated in one section of a statute but omitted from a similar enumeration in a closely-related section, the exclusion is held to be intentional and meaningful unless plain reason or authoritative sources indicate otherwise. Articles VII(1),[7] VII(4),[8] XVI(2),[9] VI(3) (read in conjunction with paragraph 2 of the Protocol),[10] and VI(4)[11] grant express rights to "nationals and companies of either Party" operating in the territory of the other party and then specifically extend the same or similar rights to "enterprises controlled by such nationals or companies." Other articles that are directly adjacent, including the article VIII(1) provision upon which C. Itoh-America seeks to rely, extend rights only to "nationals and companies of either Party" and make no mention of controlled enterprises. This is especially significant in relation to article VIII, which the State Department considered the "companion" to article VII. Airgram from the Department of State to the American embassy in Tokyo, No. A-453, dated January 7, 1952. The majority would interpret such distinctions as being purely haphazard. I am unable to accept that view when the negotiating documents and historical context of the Treaty indicate that it was crafted with the greatest care.
 
 
 63
 Furthermore, the specific inclusion of controlled enterprises in the five articles listed above becomes completely redundant if Japanese-controlled American companies are already companies of Japan, because in each article the right has previously been extended to companies of Japan. One could argue that the additional extension of the rights to controlled enterprises in these five articles was only done out of an excess of caution, to address a perceived ambiguity or possible misunderstanding. Yet if that were the case, surely the drafters would have either exhibited the same caution in adjacent articles, such as article VIII(1), or devoted similar effort to correct the ambiguity at its source, by specifying that a Japanese-owned American company is nevertheless a "company of Japan." The majority sees a "crazyquilt pattern" in the Treaty if a Japanese-controlled American company is not a company of Japan, a characterization that I dispute in the next part of this dissent. But the majority has its own "crazyquilt pattern" to explain in these five Treaty articles that, under the majority view, blatantly duplicate grants of rights.
 
 D. The Pattern of Rights Distribution
 
 64
 The numerous redundancies and ambiguities discussed above are all created by the distortion of article XXII(3) urged upon us by the majority. In contrast, if we simply read that article in accord with its plain meaning, all of these problems disappear and each of these sections becomes a concise, appropriate, and meaningful extension of valuable rights to American business enterprises controlled by nationals or companies of Japan. But the majority maintains, along with the Second Circuit in Avigliano v. Sumitomo Shoji America, Inc., 638 F.2d 552 (2d Cir. 1981), that this reading of article XXII(3) "would create a 'crazyquilt pattern' in which branches of Japanese corporations would enjoy broad rights under the Treaty, while subsidiaries would be entitled only to minor protection." The majority finds it "illogical to infer that the drafters of the treaty intended to make such a dramatic distinction between forms of business operation," quoting Avigliano, 638 F.2d at 556.
 
 
 65
 I find these generalities either inaccurate or too broad. First of all, if the rights conferred on companies of Japan by this Treaty were assigned a weighted value, one right would probably far outweigh all others: the article VII(1) grant of "national treatment with respect to engaging in all types of ... business activities." Article VII(1) specifically extends this right of national treatment to Japanese-controlled American companies, in a narrower form of little practical significance.[12] It is therefore inaccurate to say that such a company gains only "minor protection" from the Treaty. The broadest and most important right granted by the Treaty, outweighing all others combined, is shared on a virtually equal basis by companies of Japan and their American subsidiaries.
 
 
 66
 Secondly, a close examination of the Treaty shows that the "crazyquilt pattern" seen by the majority is not as dramatic as they seem to think. Only about 20 paragraphs of the Treaty confer rights on "companies of (Japan)" without specifically extending the same right to American enterprises controlled by such companies.[13] Almost all of these 20 paragraphs confer rights that would fall into one or more of the following categories:
 
 
 67
 (1) The right is so essential to the conduct of business activities that any reasonable interpretation of the Treaty would hold it to be already conferred on American subsidiaries of Japanese companies by the general article VII(1) grant of "national subsidiary treatment" in all business activities;[14]
 
 
 68
 (2) The right is separately protected by the Constitution of the United States, and could therefore never be denied to an American subsidiary of a Japanese corporation under any circumstances;[15]
 
 
 69
 (3) The right is so fundamental to the design of our commercial and legal system that it would never be denied to American subsidiaries of United States companies, and therefore could not be denied to American subsidiaries of Japanese companies because of the article VII(1) grant of "national subsidiary treatment."[16]
 
 
 70
 I have cited examples in footnotes. My point is only that the Treaty rights of a company of Japan and its American subsidiary are virtually identical in practice. I acknowledge that the conceptual structure of the Treaty is not entirely apparent or logical in relation to these 20 paragraphs.[17] But the distinctions make little practical difference.
 
 
 71
 I can identify only one provision of the Treaty that, in practical and significant terms, is likely to cause a divergence between the Treaty rights of a Japanese-controlled American company and its Japanese parent corporation. That one provision is the article VIII(1) right from which C. Itoh-America seeks protection in this litigation. Assuming that article VIII(1) does, in fact, grant to "companies of (Japan)" an exemption from the requirements of our civil rights legislation,[18] then a Japanese-incorporated company doing business in the United States may discriminate in favor of its Japanese managerial and technical employees to the detriment of American employees,[19] while the American-incorporated subsidiary of that same company would not be able to so discriminate under my interpretation of articles XXII(3) and VIII(1). This is really the only point at which the majority's "crazyquilt pattern" emerges in practice.
 
 
 72
 Thirdly, if article VIII(1) and perhaps a few other articles do confer a superior degree of rights upon companies of Japan and not upon their American subsidiaries, I do not view this as an "illogical ... distinction." It is very reasonable that the two nations would reserve the most extraordinary degree of Treaty protection only for business enterprises created under their own laws, and would allow enterprises created under the laws of the other party to be subject to those laws on a basis equal to all other companies of that party. If a company of Japan wishes to safeguard a few superior legal rights under the Treaty, it may choose to do business in the form of a branch office. But if the Japanese company seeks to gain the additional tax and legal benefits that our laws confer on American-incorporated companies, they will create a separate legal entity under the aegis of American law. The line between Japanese incorporation and American incorporation is a bright and distinct one. If Japanese investors choose to cross that line in order to gain all the benefits of our legal system on a basis equal with American corporations, I find it eminently reasonable that they accept legal responsibilities and duties on an equal basis as well.
 
 III. Secondary Sources of Interpretation
 
 73
 My analysis up to this point has been based entirely on the language and structure of the Treaty itself. In contrast, the majority relies entirely on four secondary sources. It is certainly proper to use such sources, Block v. Compagnie Nationale Air France, 386 F.2d 323, 336-38 (5th Cir. 1967), but they should not be read selectively. For instance, the majority does not discuss a dispatch that Secretary of State Dean Acheson sent at the height of the Treaty negotiations to the American Embassy in Japan (hereinafter cited as the Acheson dispatch) with the heading "FCN Treaty. Interpretation of Certain Provisions." The Acheson dispatch was a response to a previous telegram from the embassy asking a set of questions that are not available to us now. From the tone of the Acheson dispatch, the contents were apparently intended to be delivered to the American negotiators and interpreted to the Japanese representatives. The first paragraph of the dispatch seems to be an attempt to clarify the purpose of article XXI(1)(e), an exception to the general test of corporate nationality, which I discuss in part II.B. above. That paragraph reads as follows:
 
 
 74
 The analysis of this question begins with the second sentence of Article XXII, Paragraph 3, which establishes that whether or not a juridical entity is a "company" of either Party, for treaty purposes, is determined solely by the place of incorporation. Such factors as location of the principal place of business or the nationality of the majority stockholders are disregarded. (Emphasis added).
 
 
 75
 I cannot imagine a more authoritative or explicit rejection of the majority's view that the nationality of a company under the Treaty is to be determined by the nationality of its controlling shareholders.
 
 
 76
 Secretary Acheson's view was strongly confirmed twenty-four years later by a State Department dispatch from Secretary of State Henry Kissinger. In the summer of 1975, the American embassy in Tokyo was involved in discussions with the Government of Japan regarding the Treaty status of an American-owned Japanese company the mirror image of the question we face. The Japanese government had taken the position that such a company had Japanese nationality and was thus excluded from Treaty benefits inside Japan. The American embassy had argued in response that the nationality of a majority of the shareholders determined the nationality of a corporation exactly the position taken by the majority opinion here. Telegram from the American embassy in Tokyo to the Department of State, Tokyo 11177, dated August 15, 1975. Secretary Kissinger and the State Department explicitly rejected the embassy's view in the reply dispatch of January 1976. The airgram first contains the general language quoted by the majority to the effect that article XXII(3) is only "meant to accomplish ... the establishment of a procedural test for the determination of the status of an association, i. e., whether or not to recognize it as a 'company' for purposes of the treaty." The Secretary then continues with more specific language omitted by the majority opinion:
 
 
 77
 For reasons stated above, argument in para 2 of reftel (the embassy's original telegram of inquiry) that nationality of a company is determined by nationality of shareholders is not correct. Rather, a company has nationality of place where it is established (see pp. 382-83 of Walker) (referring to the Herman Walker article cited in the majority opinion as Provisions on Companies). However, this does not mean that GOJ (Government of Japan) is free to deny treaty rights to U.S. subsidiary set up in Japan. While the company's status and nationality are determined by place of establishment, this recognition does not itself create substantive rights, which are dealt with elsewhere in the treaty. Thus, under Article VII of the Treaty, a national or company of either party is granted national treatment to control and manage enterprises they have established or acquired. Therefore, an American company (i. e., one organized under U.S. law), may manage its Japanese subsidiary (i. e., a company set up under Japanese law).... In sum, the substantive rights of U.S. nationals and companies vis-a-vis their Japanese investments accrue to them because the treaty gives specific rights to U.S. nationals and companies as regards their investments, and it is irrelevant that, for the technical reasons noted above, the status and nationality of the investment are determined by the place of its establishment. (Emphasis added).
 
 
 78
 Airgram from Secretary of State Kissinger to American embassy in Tokyo, No. A-105, dated Jan. 9, 1976 (hereafter cited as the Kissinger dispatch).
 
 
 79
 Secretary Kissinger was arguing against two extreme views, the Japanese government's view that the American-owned company incorporated in Japan had no rights under the Treaty, and the embassy view that an American-controlled Japanese company was still a company of the United States. Speaking to the Japanese government's view, Secretary Kissinger states that the definition of "company" in article XXII(3) does not deny rights under the Treaty. Of course it is quite accurate to say that a definition does not create or deny substantive rights, but it inherently limits the scope of rights conferred in other, substantive sections of the Treaty. Rejecting the extreme positions taken by the Government of Japan and the American embassy, Secretary Kissinger chose the middle view that conforms with the plain meaning of article XXII(3): an American-owned company incorporated in Japan is a "company of Japan" but still has the specific rights expressly granted to controlled enterprises by other sections of the Treaty, most notably the article VII(1) grant of national subsidiary treatment. I would apply that same analysis to C. Itoh-America.
 
 
 80
 The four secondary sources relied upon by the majority opinion are pale authority compared to such explicit statements by Secretaries of State Acheson and Kissinger. A careful reading of the first of these authorities, the Bassin Memorandum, shows that the writer was discussing article XXII in the context of a specific question from one of the Japanese negotiators about what "juridical status" meant as used in the article. Mr. Bassin answered only that limited question, and the subject of corporate nationality never came up because it is discussed in a separate and independent phrase of the article. Recognition of a juridical entity and ascription of its nationality are separate questions, and the Bassin Memorandum, quite simply, never addresses the latter.
 
 
 81
 The second authority cited by the majority opinion is a pair of statements by FCN authority Herman Walker. I read the first of these passages as direct and unambiguous support for the place-of-incorporation test:
 
 
 82
 "Every association meeting this simple test of valid existence (acknowledgment by the state under whose laws the corporation was created) must be accounted by the other party a company of the party of its creation, and have its juridical status recognized without any reservation for the laws of the forum" (emphasis added).
 
 
 83
 Provisions on Companies at 380-81. The Kissinger dispatch cites the same article by Dr. Walker as authority for this view, and the article as a whole clearly supports the place-of-incorporation test. Id. at 380-82. The second Walker quotation is, like the majority's quotation from the Kissinger dispatch, directed at a question that is different from the one we face. Dr. Walker states that "(t)he recognition of status and nationality does not of itself create substantive rights; these are dealt with elsewhere on their own merits." Id. at 383. No party to this suit has argued that the definition of corporate status and nationality in article XXII(3) creates substantive rights, but, as discussed above, a statutory definition inherently limits the distribution and scope of rights created elsewhere. The majority's quotations from Dr. Walker are entirely consistent with my interpretation of article XXII(3).
 
 
 84
 The final authorities relied upon by the majority are the 1976 cable from Secretary Kissinger and the October 1978 letter from Lee R. Marks to Abner W. Sibal. I have discussed portions of the Kissinger cable omitted by the majority, and find that the entire cable offers overwhelming support to the view that the nationality of a corporation is to be determined by the place of incorporation. The Marks-Sibal letter is only one of a pair of letters from State Department deputy legal advisors, written about one year apart, that take directly opposite views on the question before us. The letter that supports my view of articles XXII(3) and VIII(1) is dated September 11, 1979, and is from State Department Deputy Legal Advisor James R. Atwood to Lutz Alexander Prager, Assistant General Counsel of the EEOC. The majority quotes the Atwood-Prager letter in their footnote 3, but dismisses the letter as an "aberration" in State Department policy. After a full reading of the Bassin Memorandum and the Acheson and Kissinger dispatches, it seems apparent that the Marks-Sibal letter is, in fact, the aberration. But I find both letters to be entirely conclusory and largely insignificant in light of the clear position taken in the Acheson and Kissinger dispatches.
 
 
 85
 To summarize, the majority rejects the plain meaning of article XXII(3) even though their reading creates major problems in the internal structure and consistency of the Treaty. Their authorities for this reading are four secondary sources, two of which (the Kissinger dispatch and Herman Walker articles) clearly support the plain meaning of article XXII(3), one of which (the Bassin Memorandum) is inconclusive, and one of which (the Marks-Sibal letter) is offset by an equal or superior interpretation to the contrary (the Atwood-Prager letter). The majority ignores the Acheson dispatch, the most authoritative secondary source available to us. In contrast, if we simply follow the clear test set out in article XXII(3) and hold that a company incorporated under United States law is a "company of the United States," the Treaty is a precise and cohesive document. This reading of article XXII(3) is supported by consistent, explicit, and authoritative interpretations by the State Department dating back to the height of the Treaty negotiations in 1952. I would hold that C. Itoh-America is not a company of Japan but a company of the United States and is, therefore, not within the terms of article VIII(1).
 
 
 
 [1]
 The necessity for such a provision is well illustrated by another excerpt from the memorandum:
 Mr. Otabe inquired whether a Zaidan Hojin was covered by paragraph 3, and, if so, what would be the nature of national treatment accorded such organizations in the United States. He explained that a Zaidan Hojin is a duly organized juridical person with given property, established for the purpose of employing or disposing of said property for a given public purpose. An example of a Zaidan Hojin, he added, would be an endowed private library.
 Mr. Bassin replied such an organization would be considered a juridical person in the United States, pursuant to the provisions of paragraph 3, if it were so considered in Japan.
 Bassin Memorandum, at 5.
 
 
 [2]
 A State Department cable notes that Mr. Walker formulated the modern concept of FCN treaties and negotiated many treaties on behalf of the United States. Airgram from Secretary of State Kissinger to American Embassy in Tokyo, No. A-105, dated Jan. 9, 1976. Mr. Walker also served the State Department as Advisor on Commercial Treaties. See United States Practice, supra, at 229
 
 
 [3]
 Spiess calls to our attention a State Department letter of September 1979, in which a deputy legal advisor suggests that "it was not the intent of the negotiators to cover locally incorporated subsidiaries." Letter from James R. Atwood to Lutz Alexander Prager (September 11, 1979). This letter represents the first time, to our knowledge, that the State Department departed from the position expressed in the 1952 Bassin Memorandum, the 1976 Kissinger cable, and the 1978 letter by James Atwood. For this reason, we regard it as an aberration in State Department policy
 
 
 [4]
 C. Itoh-America argues that State Department practice in administering the immigration laws is further evidence that Japanese subsidiaries incorporated in the United States are entitled to Treaty protection. The company argues that articles I, VII, and VIII of the Treaty should be read together to create a right of "companies of Japan" to employ Japanese citizens. Article I(1) permits Japanese citizens to enter and remain in the United States "for the purpose of carrying on trade between the territories of the two Parties." In C. Itoh-America's view, this right is implemented by section 101(a)(15)(E)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(E)(i) (1970), which grants foreign nationals special visa privileges to enter the United States as "treaty traders." The Department of State has granted treaty trader status to Japanese employees working for American subsidiaries of Japanese corporations. See 22 C.F.R. § 4140(a) (treaty trader must be employed by "an organization which is principally owned by a person or persons having the nationality of the treaty country"). C. Itoh-America concludes that the Department has permitted American subsidiaries of Japanese corporations to assert a right to entry under article I, and that it should be permitted to assert rights under article VIII as well
 Article I grants only a right to individuals to enter the country. C. Itoh-America can assert this right only as an adjunct of its own right to employ Japanese citizens. Thus, the argument depends on a unitary construction of articles I, VII, and VIII. The company has presented no evidence, other than the text of the Treaty and the immigration laws, that articles I, VII, and VIII were meant to be interpreted in this way. Walker lends some support to this theory. See Modern Treaties, supra, at 813 & n. 18. Nevertheless, because our decision that C. Itoh-America can assert Treaty rights is amply supported on other grounds, we need not, and do not, reach this issue.
 
 
 [5]
 The dissent repeatedly characterizes our holding as a view that "the nationality of a company under the Treaty is to be determined by the nationality of its shareholders." E. g., post, at 370. This is not the holding of the court. Rather, we assert that article XXII(3) provides no explicit definition of "company of either Party," just as it provides no definition for "national of either Party," another oft-used Treaty expression. Our conclusion that C. Itoh-America is a company of Japan for Treaty purposes is based, not on the application of an explicit test conjured up from the text of the Treaty, but on the clearly expressed intent of the parties to extend Treaty protection evenly to subsidiaries whether unincorporated or incorporated under the law of either Party. We do not reach or decide whether a corporate subsidiary in which a Japanese trader owns less than a 100 percent interest should be considered a company of Japan under the Treaty
 Under a proper understanding of our holding, Judge Reavley's views, though reasonable, lose much of their force. We agree with Judge Reavley that the Acheson and Kissinger cables belie the view that the Treaty establishes a test of corporate nationality based on the nationality of the shareholders. We disagree, however, with the suggestion that these cables convert the language of article XXII(3) into a definitive test of the Treaty term "companies of either Party."
 
 
 [6]
 Although the most-favored-nation standard was considered less desirable than national treatment at the time the Japanese Treaty was negotiated, it was used in previous treaties to confer special privileges on aliens. See Modern Treaties, supra, at 811. As a result, the national treatment and most-favored-nation standards were often used in conjunction, even in the post-war treaties, to guarantee that foreigners would benefit from the most extensive protection in every case. See e. g., Treaty, art. IV(1) (companies of either party "accorded national treatment and most-favored-nation treatment with respect to access to the courts of justice")
 
 
 [7]
 Even Avigliano concedes that "the clause 'of their choice' was also intended, in furtherance of the overall purpose of the Treaty, to facilitate a party's employment of its own nationals to be the extent necessary to ensure its operational success in the host country." Avigliano, supra, at 559
 
 
 [8]
 Spiess suggests that implementation of the article VIII(1) right would permit companies like C. Itoh-America to violate, not only Title VII, but also labor relations statutes and laws preventing exploitation of workers and practices such as child labor. The Second Circuit has expressed a similar concern. See Avigliano, supra, at 559. C. Itoh-America, on the other hand, argues that the "of their choice" provision entails a broad immunity from all domestic employment legislation
 The extent to which this principle applies outside the context of national origin discrimination is unclear. See Note, Commercial Treaties and the American Civil Rights Laws: The Case of Japanese Employers, 31 Stan.L.Rev. 947, 955 (1979). We need not decide in today's case whether the article VIII(1) right extends beyond discrimination in favor of Japanese nationals in executive and technical positions, supervisory jobs which would hardly be filled by union members, minors or exploited workers. We note only that article VIII(1) is based on the principle of home office control of the foreign investment.
 
 
 [9]
 Spiess and his fellow plaintiffs filed suit under section 1981 as well as under Title VII. Because the Treaty was ratified after the enactment of section 1981, it supersedes the federal statute. See Hijo v. United States, 194 U.S. 315, 324, 24 S.Ct. 727, 729, 48 L.Ed. 994, 996 (1904)
 
 
 [1]
 For example, the Bassin Memorandum records an exchange between Mr. Bassin and Mr. Otabe, one of the Japanese representatives, as to whether a zaidan hojin would be considered a "company" under the Treaty. A zaidan hojin is a juridical person charged with the duty of using or employing certain property for a public purpose, such as an endowed public library. Bassin Memorandum at 5
 
 
 [2]
 I will not attempt to use neutral terms at all points but will occasionally discuss the Treaty only in terms of the rights it confers upon Japan to do business in the United States. I adopt this convention for simplicity of expression and because that choice embodies the specific legal question we face in this case
 
 
 [3]
 See the Treaty sections quoted in notes 6-10 below
 
 
 [4]
 The importance of the term "company of (Japan or the United States)" is shown by the fact that it is used at least 40 times in the Treaty and Protocol. Article XXI(1)(e) is another indication that the drafters were highly sensitive to the issue of corporate nationality. That section addresses the possibility that nationals of third countries might try to gain Treaty rights illegitimately merely by incorporating in Japan or the United States. That article is fully discussed in section II.B. of this dissent
 
 
 [5]
 The majority states in footnote 5 of their opinion that they do not mean to establish a general test of corporate nationality under the Treaty. This may reserve a question of degree or quantity, but the effect of their construction of the Treaty is nevertheless to derive the nationality of a company from the nationality of the controlling shareholders
 If the majority means to imply that they might reach a different test of corporate nationality if a company were only 70% (or 51% or 40%) owned by Japanese interests, they make the Treaty even more ambiguous and vague.
 
 
 [6]
 The principle was clearly stated in the celebrated decision of the International Court of Justice in Barcelona Traction, Light and Power Company, Limited (Belgium v. Spain), 1970 I.C.J. Rep. 3, 42:
 In allocating corporate entities to States for purposes of diplomatic protection, international law is based, but only to a limited extent, on an analogy with the rules governing the nationality of individuals. The traditional rule attributes the right of diplomatic protection of a corporate entity to the State under the laws of which it is incorporated and in whose territory it has its registered office. These two criteria have been confirmed by long practice and by numerous international instruments.
 Dr. Herman Walker, the FCN authority so heavily relied upon by the majority, has called this the "simple 'classical' test" of corporate nationality. H. Walker, Companies, ch. VII, in R.R. Wilson, United States Commercial Treaties and International Law 182, 193 (1960).
 
 
 [7]
 Article VII(1) reads as follows:
 Nationals and companies of either Party shall be accorded national treatment with respect to engaging in all types of commercial, industrial, financial and other business activities within the territories of the other Party, whether directly or by agent or through the medium of any form of lawful juridical entity. Accordingly, such nationals and companies shall be permitted within such territories: (a) to establish and maintain branches, agencies, offices, factories and other establishments appropriate to the conduct of their business; (b) to organize companies under the general company laws of such other Party, and to acquire majority interests in companies of such other Party; and (c) to control and manage enterprises which they have established or acquired. Moreover, enterprises which they control, whether in the form of individual proprietorships, companies or otherwise, shall, in all that relates to the conduct of the activities thereof, be accorded treatment no less favorable than that accorded like enterprises controlled by nationals and companies of such other Party (emphasis added).
 
 
 [8]
 Article VII(4) reads as follows:
 Nationals and companies of either Party, as well as enterprises controlled by such nationals and companies, shall in any event be accorded most-favored-nation treatment with reference to the matters treated in the present Article (emphasis added).
 
 
 [9]
 Article XVI(2) reads as follows:
 Articles produced by nationals and companies of either Party within the territories of the other Party, or by companies of the latter Party controlled by such nationals and companies, shall be accorded therein treatment no less favorable than that accorded to like articles of national origin by whatever person or company produced, in all matters affecting exportation, taxation, sale, distribution, storage and use (emphasis added).
 
 
 [10]
 Article VI(3) reads as follows:
 Property of nationals and companies of either Party shall not be taken within the territories of the other Party except for a public purpose, nor shall it be taken without the prompt payment of just compensation. Such compensation shall be in an effectively realizable form and shall represent the full equivalent of the property taken; and adequate provision shall have been made at or prior to the time of taking for the determination and payment thereof.
 Article VI(3) is extended by paragraph 2 of the Protocol, which was specifically incorporated into the Treaty as follows:
 The provisions of Article VI, paragraph 3, providing for the payment of compensation shall extend to interests held directly or indirectly by nationals and companies of either Party in property which is taken within the territories of the other Party (emphasis added).
 
 
 [11]
 Article VI(4) reads as follows:
 Nationals and companies of either Party shall in no case be accorded, within the territories of the other Party, less than national treatment and most-favored-nation treatment with respect to the matters set forth in paragraphs 2 (relating to the right to be free from unlawful entry, molestation, and search) and 3 (relating to right to be free from condemnation of property except for a public purpose, and right to compensation therefor) of the present Article. Moreover, enterprises in which nationals and companies of either Party have a substantial interest shall be accorded, within the territories of the other Party, not less than national treatment and most-favored-nation treatment in all matters relating to the taking of privately owned enterprises into public ownership and to the placing of such enterprises under public control (emphasis added).
 
 
 [12]
 See the discussion in part II.B. above
 
 
 [13]
 See articles IV(1), (2); V(1); VI(1), (2); VIII(1), (3); IX(1), (2), (3), (4); X; X(1), (3), (4); XII(1), (4); XIV(5); XV(2); and XVII(2)
 
 
 [14]
 See, e. g., articles IX(1) (right to lease land and buildings appropriate to conduct of activities otherwise permitted under Treaty), IX(2) (right to acquire movable property), IX(4) (right to dispose of property), and XI(1) (right to be taxed on a basis equal to national corporations)
 
 
 [15]
 See, e. g., articles IV(1) (right of access to courts and administrative bodies), VI(1) (right to protection of property within the host country), VI(2) (right to be free from unlawful entry, molestation, and search), and IX(3) (right to dispose of property within 5 years if laws of testate or intestate succession prevent national treatment)
 
 
 [16]
 See, e. g., articles XII(1) (right to transfer funds and instruments outside the United States), XIV(5) (right to import and export), XV(2) (right to have an appeals procedure from administrative decisions in relation to customs matters), and XVII(2) (right of national treatment in access to government sales, contracts, and concessions)
 
 
 [17]
 But as I noted in section II.C. above, the majority's view creates equal or greater illogic in the Treaty
 
 
 [18]
 Under my analysis, we would have no need to reach this question
 
 
 [19]
 For instance, C. Itoh-America currently classifies its employees into a "Japanese staff" and an "American staff." Over 90% of management-level positions are filled exclusively by the Japanese staff. The Japanese staff also receives higher salaries, benefits, and bonuses than counterparts on the American staff. All federal, state, and local taxes on these greater benefits are paid by the company
 Some of these practices may be justified by the need of Japanese investors "to control and manage enterprises which they have established or acquired." Article VII(1). That right is guaranteed by the Treaty in absolute terms, and United States law may not infringe upon that right unless there is a clear Congressional intent otherwise. If some of C. Itoh-America's discriminatory practices are protected by article VII(1), I suspect that they could also claim protection from the BFOQ exception to Title VII. But these are questions that should be determined at trial.