Lisa M. AVIGLIANO, Dianne Chenicek, Rosemary T. Cristofari, Catherine Cummins, Raellen Mandelbaum, Maria Mannina, Sharon Meisels, Frances Pacheco, Joanne Schneider, Janice Silberstein, Reiko Turner and Elizabeth Wong, Plaintiffs-Appellees,

v.

SUMITOMO SHOJI AMERICA, INC., Defendant-Appellant.

No. 314, Docket 80-7418.

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1980.

Decided Jan. 9, 1981.

J. Portis Hicks, New York City (Wender, Murase & White, New York City, of counsel), for appellant.

Lewis M. Steel, New York City (Eisner, Levy, Steel & Bellman, P. C., New York City, of counsel), for appellees.

Marcia B. Ruskin, Atty., Equal Employment Opportunity Commission, Wash-

ington, D. C. (Leroy D. Clark, Gen. Counsel, Joseph T. Eddins, Associate Gen. Counsel, Lutz Alexander Prager, Atty., Equal Employment Opportunity Commission, Washington, D. C., of counsel), for amicus curiae Equal Employment Opportunity Commission.

Before LUMBARD, MANSFIELD and MESKILL, Circuit Judges.

MANSFIELD, Circuit Judge:

Sumitomo Shoji America, Inc. ("Sumitomo"), a New York-incorporated, wholly-owned subsidiary of a Japanese commercial firm, appeals pursuant to 28 U.S.C. § 1292(b) from an order of the District Court for the Southern District of New York entered by Judge Charles H. Tenney, denying its motion to dismiss this class action against it by female secretarial employees claiming that its practice of hiring only male Japanese nationals for management-level positions discriminates against them on the basis of sex and national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), the Civil Rights Act of 1966, 42 U.S.C. § 1981, and the Thirteenth Amendment. Dismissal was sought by Sumitomo pursuant to F.R.Civ.P. 12(b)(6) on the ground that the 1953 Treaty of Friendship, Commerce and Navigation between the United States and Japan, 4 U.S.T. 2063 (the "Treaty" or "Japanese Treaty"), exempts Japanese trading companies and their wholly-owned subsidiaries incorporated in the United States from the application of Title VII. Judge Tenney denied Sumitomo's motion insofar as it sought dismissal of plaintiffs' Title VII claims,[1] on the ground that the Treaty was not meant to protect the employment practices of Japanese subsidiaries incorporated in the United States. D.C., 473 F.Supp. 506. Sumitomo sought an immediate appeal of this question under 28 U.S.C. § 1292(b), and that request was granted.[2]

---

1. The district court did, however, dismiss plaintiffs' § 1981 claim on other grounds, and also found that plaintiffs' Thirteenth Amendment claim had been abandoned.

2. *Avigliano, et al. v. Sumitomo Shoji America, Inc.,* No. 77 Civ. 5641 (CHT) (August 9, 1979) (unreported). Judge Tenney refused to certify two questions of law which plaintiffs had

We affirm, but on grounds other than that relied on by the district court. We hold that Sumitomo was entitled to invoke the employment provisions of the Treaty, but that the Treaty does not exempt Japanese companies operating in the United States, whether or not they are incorporated in the United States, from American laws prohibiting discrimination in employment.

The Japanese Treaty is a commercial agreement designed to encourage trade and investment between the United States and Japan. It is one of several dozen similar treaties entered into by the United States in the post-World War II period, and carries on a tradition antedating the Constitution. See generally, Walker, *Treaties for the Encouragement and Protection of Foreign Investment: Present United States Practice,* 5 Am.J.Comp.L. 229, 230–31 (1956) (hereinafter cited as *Treaties*). The general aim of these treaties is to

> "establish or confirm in the potential host country a governmental policy of equity and hospitality to the foreign investor. This means, above all, assurance that the enterprise and property of the alien will be respected and that he will be accorded equal protection of the laws alike with citizens of the country." *Id.* at 230.

In the Japanese Treaty, as in almost all other Friendship, Commerce and Navigation ("FCN") agreements, the goal of equal protection of the laws is put into effect by means of specific provisions "based in general upon the principles of national and of most-favored-nation treatment unconditionally accorded." 4 U.S.T. at 2066.

The heart of the Japanese Treaty is Article VII, which the State Department has called "the basic 'establishment' provision." Outgoing Airgram No. A–453, Department of State to USPOLAD, Tokyo, dated January 7, 1952. Article VII provides in relevant part that:

> "Nationals and companies of either Party shall be accorded national treatment with respect to engaging in all types of commercial, industrial, financial and other business activities within the territories of the other Party, *whether directly or by agent or through the medium of any form of lawful juridical entity.* Accordingly, such nationals and companies shall be permitted within such territories: (a) to establish and maintain branches, agencies, offices, factories and other establishments appropriate to the conduct of their business; (b) *to organize companies under the general company laws of such other Party, and to acquire majority interests in companies of such other Party*; and (c) *to control and manage enterprises which they have established or acquired.* Moreover, enterprises which they control, whether in the form of individual proprietorships, companies or otherwise, shall, in all that relates to the conduct of the activities thereof, be accorded treatment no less favorable than that accorded like enterprises controlled by nationals and companies of such other Party." 4 U.S.T. at 2069. (Emphasis supplied.)

In order to facilitate the staffing of overseas operations, the Treaty provides in Article I that:

> "Nationals of either Party shall be permitted to enter the territories of the other Party and to remain therein:

sought to appeal: whether an allegation of sex and nationality discrimination makes out a valid cause of action under § 1981, and whether defendant's counterclaims sounding in common law tort should have been dismissed. Neither issue is before us at this time.

Before the appeal could be heard counsel for Sumitomo sought reconsideration of Judge Tenney's refusal to dismiss, based on the U. S. Department of State's recent release of a number of documents which apparently were relevant to a proper interpretation of the Japanese Treaty. Judge Tenney granted Sumitomo's request for reconsideration, and this Court in effect remanded to Judge Tenney by denying Sumitomo's permission to appeal, but without prejudice to a later renewal of that request. After reconsideration based on the State Department documents, Judge Tenney once again denied Sumitomo's motion to dismiss, this time on the ground that, while Japanese subsidiaries incorporated in the United States are given some rights by the Treaty, the specific provision of the Treaty on which Sumitomo was relying was not intended to apply to subsidiaries. *Avigliano, et al. v. Sumitomo Shoji America, Inc.,* No. 77 Civ. 5641 (CHT) (November 29, 1979) (unreported).

(a) for the purpose of carrying on trade between the territories of the two Parties and engaging in related commercial activities. . . ." *Id.* at 2066,

and in Article VIII that

"Nationals and companies of either Party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents and other specialists *of their choice.*" *Id.* at 2070. (Emphasis supplied).

Implementing these provisions, the State Department has issued regulations applicable to the FCN treaties which greatly facilitate the entry into the United States of Japanese nationals who will work as "treaty traders" for Japanese trading units set up pursuant to Article VII of the Treaty. 22 C.F.R. § 41.40.

In addressing defendant's motion to dismiss based on the Treaty, the district court did not rule on whether the freedom-of-choice language of Article VIII ("companies of either Party shall be permitted to engage, within the territories of the other Party, . . . executive personnel . . . of their choice") was sufficiently broad to exempt Japanese subsidiaries operating in the United States from the anti-discrimination provisions of Title VII of the Civil Rights Act of 1964. 473 F.Supp. at 509–13. Its ruling was instead limited to the question of Sumitomo's standing. In its first opinion, the court held that a U. S.-incorporated subsidiary such as Sumitomo could not "invoke the aegis of the Treaty as sanction for its employment practices," 473 F.Supp. at 509, because the definitional section of the Treaty, Article XXII(3), provides that:

"Companies constituted under the applicable laws and regulations within the territories of either Party *shall be deemed companies thereof* and shall have their juridical status recognized within the territories of the other Party." Article XXII(3), 4 U.S.T. at 2080; *quoted at* 473 F.Supp. at 509. (Emphasis supplied).

In the court's opinion, the emphasized language of Article XXII(3) had the effect of classifying Sumitomo as an American, not a Japanese corporation, and thus barred it from invoking Article VIII. In its second opinion (dated November 29, 1979) the court conceded that

"Article XXII(3) was not intended to bar locally incorporated subsidiaries of foreign companies from claiming any substantive rights under the Treaty."

Nevertheless, despite its finding that Article XXII(3) did no more than determine "an entity's status" and was not meant to limit or define the substantive rights which an entity was to enjoy under the Treaty, the district court refused to alter its original view that Sumitomo lacked standing to invoke Article VIII:

"Articles VI(4) and VII(1) & (4), by their terms, give 'enterprises in which nationals and companies . . . have a substantial interest' and enterprises controlled by nationals and companies, respectively, substantive rights. The drafters knew how to give locally incorporated subsidiaries rights under specific articles. In Article VIII(1) they did not do so. The freedom-of-choice rights are given to 'nationals and companies of either Party . . . within the territories of the other Party.' Because the provision does not by its own terms extend to locally incorporated subsidiaries, the Court must look to Article XXII(3) to determine whether 'nationals and companies' can be read to include subsidiaries. That Article provides that '[c]ompanies constituted under the applicable laws and regulations within the territories of either Party shall be deemed parties thereof.' By this language Sumitomo is a United States company. It is not a Japanese company and is thereby ineligible for freedom-of-choice protection within the territories of the United States."

## DISCUSSION

*Sumitomo's Standing*

■ We are satisfied that the Treaty's provisions may be invoked by a wholly-owned Japanese subsidiary incorporated in the United States to the same extent that

they may be availed of by Japanese corporations or firms operating in the United States. To hold that the Japanese business enterprise forfeits its rights under the Treaty merely because it chooses to function through a wholly-owned locally-incorporated subsidiary would in our view disregard substance for form, something which we have previously rejected in treaty construction. *Reed v. Wiser*, 555 F.2d 1079, 1085–86 (2d Cir.), *cert. denied*, 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977). Moreover, such a reading would overlook the purpose of the Treaty, which was not to protect foreign investments made through branches, but rather to protect foreign investments generally. See generally, *Eck v. United Arab Airlines, Inc.*, 360 F.2d 804, 812 (2d Cir. 1966); *Maximov v. United States*, 299 F.2d 565, 568 (2d Cir. 1962), *affd.*, 373 U.S. 49, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963). In addition, if the district court's reading were adopted, a Japanese enterprise could easily circumvent such a construction by simply transforming its wholly-owned U. S. subsidiaries into branches. To adopt such a reading would also in our opinion do violence to the admittedly unitary structure of Articles VII and VIII, see, e. g., Foreign Service Despatch No. 2529, from High Commissioner for Germany to the Department of State, dated March 18, 1954, p. 1. It is unlikely that the parties to the Treaty would have agreed to grant each other broad rights to establish and manage subsidiaries abroad in Article VII, and then gone on to bar those same subsidiaries from invoking almost all of the substantive provisions which the Treaty contains.

Finally, if we were to accept the view that the three provisions in the Treaty which explicitly grant rights to subsidiaries (Article VI(4), Article VII(1) and Article VII(4)) exhaust the rights to be accorded to them, a crazy-quilt pattern would emerge. Under such a reading *Japanese branches* in the United States would be guaranteed "access to the courts of justice" (Article IV(1)), protected against "unlawful entry or molestation" (Article VI(2)), given the right to dispose of "property of all kinds" (Article IX(4)), allowed to obtain and maintain "pat-

ents of invention" (Article X), permitted to make "payments, remittances and transfers of funds or financial instruments" (Article XII(1)), and allowed to engage in "importation and exportation" (Article XIV(5)). *Japanese subsidiaries*, on the other hand, would not be guaranteed any of the rights conferred on Japanese branches operating in the United States, but would instead have to be content with national treatment in such areas as "the taking of privately owned enterprises into public ownership and ... the placing of such enterprises under public control" (Article VI(4)). It is illogical to infer that the drafters of the Treaty intended to make such a dramatic distinction between forms of business operation or to act in such a haphazard way.

In our view the three provisions in the Treaty which specifically mention subsidiaries were not intended to define the outer limits of the rights to be accorded to them, but were instead designed to add to the rights which parties were to enjoy in their capacity as "companies of either Party." This construction furthers the Treaty's purpose, which is to support foreign investment generally, regardless of the specific corporate vehicle employed. Given the complete absence of any evidence in the Treaty's legislative history suggesting that only Japanese branches were to be given the various specific guarantees listed above but that Japanese subsidiaries were not, we are persuaded that the form of business operation was not considered relevant to the question of which entities could invoke the substantive provisions of the Treaty, except in three instances where *extra* protection was to be accorded to subsidiaries.

This interpretation also finds support in negotiations preceding the ratification of another FCN treaty, that between the United States and the Netherlands. There, Dutch negotiators expressed concern that the proposed treaty language (which was identical in all relevant respects to the language contained in the Japanese Treaty) might be read as not conferring equal benefits on branches and subsidiaries (or "controlled companies," in the usage of the ne-

gotiators). The Dutch were particularly concerned that the provision in Article XXIII(3) of the Dutch treaty (which tracked the language of Article XXII(3) of the Japanese Treaty) would exclude locally-incorporated subsidiaries from all substantive benefits accorded to "companies of either Party." State Department negotiators made it clear that this was not the case, and were even prepared to insert a clarifying phrase in Article XXIII(3), if necessary:

> "[D]espite a superficial appearance to the contrary, the legal adviser's formulation of the proviso to be inserted in Article XXIII paragraph 3 was *not* calculated to detract in any way from the rights and privileges a 'controlled company' would otherwise enjoy.... [T]he treaty is always a floor and not a ceiling. The effect of the legal adviser's formulation was to assure that the 'controlled company' will always, as a minimum, get everything that the parent company gets as a matter of treaty *right*—but was not calculated to detract from any additional privileges that the 'controlled company' may actually have.... The Department has the same interest as [the Dutch negotiators] in avoiding damage to the position of 'controlled companies', because Americans have 'controlled companies' abroad just as the Dutch have them in the U. S." Official-Informal Letter from Herman Walker, Jr.,[3] Trade Agreements and Treaty Division, Department of State, to Counselor for Economic Affairs, American Embassy, The Hague, Netherlands, dated October 28, 1955. (Emphasis in original).

After extensive discussions on the issue, the Dutch negotiators concluded that there was in fact no need to include in the Treaty a provision explicitly conferring parent company rights on subsidiaries:

> "[N]obody would deny to a company controlled by nationals or companies of one of the contract Parties the treatment, which is accorded to the parent company, except perhaps in a very special case e. g. taxation.... As the principle is generally accepted, I think it would be superfluous to spell it out." Letter from Netherlands Negotiators to Economic Counselor, U. S. Embassy, The Hague, Netherlands, dated November 8, 1955.

This incident corroborates our view, based on the language and purpose of the Japanese Treaty, that those provisions which specifically grant rights to subsidiaries were not intended to bar subsidiaries from enjoying the additional rights granted to branches.

In short, as the district court recognized (but did not apply), Article XXII(3) defines a company's nationality for the purpose of recognizing its status as a legal entity but not for the purpose of restricting substantive rights granted elsewhere in the Treaty. This view of Article XXII(3) has been adopted consistently throughout the life of the Treaty, see, e. g., Department of State Despatch No. 13 from Office of the United States Political Adviser for Japan, dated April 8, 1952; Walker, *Provisions on Companies in United States Commercial Treaties*, 50 Am.J.Int'l L. 373, 383 (1956); Department of State Airgram No. A–105, to American Embassy, Tokyo, dated January 9, 1976, and in our opinion is supportive of the general policies underlying the Treaty. The district court's acceptance of this general proposition is inconsistent with its eventual conclusion that Article XXII(3) bars Sumitomo from invoking Article VIII.[4] Since Sumitomo is a wholly-owned subsidi-

---

3. The author's identity, while not appearing on the letter itself, can be determined by noting the addressee of the letter written in reply, Official-Informal Letter from Counselor of Embassy for Economic Affairs, American Embassy, The Hague, Netherlands, dated November 4, 1955.

4. Article XXII(3) leaves open the determination of whether a subsidiary incorporated in the United States is sufficiently "Japanese" to invoke the Treaty's various substantive provisions. Resolution of this issue would depend on a case-by-case analysis of the relevant facts. In resolving the issue the regulations adopted by the Department of State in connection with admission of treaty traders are relevant. For a treaty trader to be admitted,

> "The employment must be ... by an organization which is principally owned by a person or persons having the nationality of the treaty country." 22 C.F.R. § 41.40(a).

ary of a Japanese corporation, it is properly classified as a Japanese company for the purpose of invoking the substantive provisions of the Treaty, including Article VIII.[5]

*Relationship Between Article VIII of the Treaty and Title VII of the Civil Rights Act of 1964*

■ Turning to the question of whether the freedom-of-choice language of Article VIII of the Treaty exempts Sumitomo from

Title VII of the Civil Rights Act of 1964 as far as it executive personnel are concerned,[6] we hold that the Treaty does not have such effect. The right of Japanese firms operating in the United States under the Treaty to hire executives "of their choice" does not give them license to violate American laws prohibiting discrimination in employment.

The background of the Treaty does not support the expansive interpretation of the

---

The State Department has supplemented this basic regulation with visa rules further prescribing the standards to be met by treaty traders entering the United States. These rules define the nationality of a corporation eligible to employ treaty traders as follows:

"The nationality of a firm is determined for the purpose of section 101(a)(15)(E) [8 U.S.C. § 1101(a) of the Immigration and Nationality Act of 1952] by the nationality of those persons who own the principal amount (i. e., more than 50 percent) of the stock of that corporation, regardless of the place of incorporation." 9 *Foreign Affairs Manual*, Part II, § 41.40, Note 8. See generally, *Matter of N.S.*, VII I. & N.Decs. 426, 428 (1957).

**5.** We are aware that the State Department has recently reached a conclusion on this issue which is at variance with ours. See Letter from James R. Atwood, Deputy Legal Adviser, U. S. Department of State to Lutz Alexander Prager, Esq., Assistant General Counsel, Equal Employment Opportunity Commission, dated September 11, 1979, *reprinted in* 74 Am.J.Int'l L. at 158–59 (1980) ("it was not the intent of the negotiators to cover locally-incorporated subsidiaries").

Even after giving weight to the State Department's views, *Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961), we do not find its position persuasive. The September 11, 1979, letter announcing the Department's position directly contradicted a similar letter written on behalf of the Department less than a year earlier. Letter of Lee R. Marks, Deputy Legal Adviser, U. S. Department of State to Abner W. Sibal, General Counsel, Equal Employment Opportunity Commission, dated October 17, 1978, *reprinted in* 73 Am.J. Int'l L. at 281–84 (1979) ("In determining the scope of Article VIII [of the Japanese Treaty, we see no grounds for distinguishing between subsidiaries incorporated in the United States . . . and those operating as unincorporated branches"). Moreover, both letters were conclusory in tone, providing little guidance as to how the author reached the position adopted. Finally, neither of the letters referred to any documentary evidence supporting its position, nor did the 1979 letter explain how the 1978 letter writer had fallen into error.

On September 26, 1980, long after this appeal had been taken, counsel for the Equal Employment Opportunity Commission ("EEOC"), which is participating in this case as *amicus curiae*, sent us a copy of a State Department document purporting to be a letter dated September 9, 1980, from the Department of State to the Government of Denmark to the effect that it was not the intent of negotiators of such a FCN treaty to permit locally-incorporated subsidiaries to invoke its provisions. However, the letter bears evidence that the EEOC, several months prior to the transmittal of the State Department's letter, had participated in its preparation (it bears the notations "Clearances: · EEOC/GC L. Prager," who is counsel for the EEOC as amicus on this appeal), from which it might be inferred that the letter was designed to support the EEOC's position here.

Under the circumstances it was improper for the EEOC to have submitted the September 9th letter to us. However, since we give it no weight whatsoever we deny Sumitomo's motion for permission to investigate its provenance.

**6.** Although Judge Tenney limited the question being certified to the narrow issue of Sumitomo's standing to invoke Article VIII of the Treaty and made it quite clear that he had not reached any opinion as to the degree of protection which Article VIII might provide from charges of discrimination under Title VII, it would be a waste of judicial resources to remand without reaching the substantive question which Sumitomo's motion to dismiss inevitably poses. The issue has been fully briefed and argued by the parties before us. Evidence concerning Sumitomo's hiring practices would not help us resolve the question. Failure to resolve the question would only open the door to a wasteful second appeal after trial below. Under these circumstances we are not limited to deciding the question formulated by the district court, *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 994–95 (2d Cir.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); *Capital Temporaries, Inc. v. Olsten Corp.*, 506 F.2d 658, 660 (2d Cir. 1975).

words "of their choice" urged by Sumitomo. At the time when the Treaty was negotiated, a number of American states and many foreign countries severely restricted the employment of noncitizens within their boundaries. Note, *Commercial Treaties and the American Civil Rights Laws: The Case of Japanese Employers*, 31 Stan.L.Rev. 947, 952–53 & n.28 (1979); S. Metzger, *International Law, Trade and Finance: Reality and Prospects* 151 (1962). The provision in Article VIII of the Treaty allowing companies of either party to engage executive personnel "of their choice" when operating in the other party's territory was a reaction to those restrictions. It was primarily intended to exempt companies operating abroad from local legislation restricting the employment of noncitizens. Walker, *Treaties, supra*, at 234 ("management is assured freedom of choice in the engaging of essential executive and technical employees in general, regardless of their nationality, without legal interference from 'percentile' restrictions and the like"). See generally, Foreign Service Despatch No. 2529 from HICOG Bonn to Department of State, dated March 18, 1954 (German FCN treaty); H. Steiner & D. Vagts, *Transnational Legal Problems* 37–38 (1968).

Although the clause "of their choice" was also intended, in furtherance of the overall purpose of the Treaty, to facilitate a party's employment of its own nationals to the extent necessary to insure its operational success in the host country, no evidence supports Sumitomo's broad interpretation which carried to its logical conclusion, would immunize a party not only from Title VII but also, from laws prohibiting employment of children, § 12 of the Fair Labor Standards Act, 29 U.S.C. § 212, laws granting rights to unions and employees, Labor Management Relations Act, 29 U.S.C. §§ 141–87, and the like.

Subjecting a Japanese company to Title VII is consistent with the language and purpose of Article VIII of the Treaty, since Title VII, construed in the light of the Treaty, would not preclude the company from employing Japanese nationals in positions where such employment is reasonably necessary to the successful operation of its business. Section 703(e) of Title VII, 42 U.S.C. § 2000e–2(e), expressly provides that

> "it shall not be an unlawful employment practice for an employer to hire and employ employees, ... on the basis of ... national origin in those certain instances where ... national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise...."

Although the "bona fide occupational qualification" ("bfoq") exception of Title VII is to be construed narrowly in the normal context, *Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977), we believe that as applied to a Japanese company enjoying rights under Article VIII of the Treaty it must be construed in a manner that will give due weight to the Treaty rights and unique requirements of a Japanese company doing business in the United States, including such factors as a person's (1) Japanese linguistic and cultural skills, (2) knowledge of Japanese products, markets, customs, and business practices, (3) familiarity with the personnel and workings of the principal or parent enterprise in Japan, and (4) acceptability to those persons with whom the company or branch does business. To require the Japanese company to go forward with some evidence of bfoq status does not in our view impose undue burdens on foreign employers. In the absence of an evidentiary record on these matters, however, we cannot determine now whether all or some portion of the executive positions at Sumitomo qualify for bfoq status.

Accordingly, the case is remanded to the district court for further proceedings consistent with the foregoing.