Russell GOYETTE, Bernice Rice Gerstein, Irving Benig, Judith Teller, and Robert Ross, Plaintiffs,

v.

DCA ADVERTISING INC. and Dentsu Inc., Defendants.

Julius FILICIA, Plaintiff,

v.

DCA ADVERTISING INC. and Dentsu Inc., Defendants.

Nos. 91 Civ. 3518 (KC), 92 Civ. 1425 (KC).

United States District Court, S.D. New York.

Aug. 6, 1993.

---

## OPINION AND ORDER

CONBOY, District Judge:

Russell Goyette, Bernice Rice Gerstein, Irving Benig, Judith Teller, Robert Ross, and Julius Filicia (collectively "plaintiffs") are all former employees of DCA Advertising Inc. ("DCA"), a wholly owned subsidiary of Dentsu, Inc. ("Dentsu") (collectively "defendants").[1] The plaintiffs claim that defendants fired them on the basis of national

1. On July 14, 1993, this Court dismissed with prejudice the charges filed by plaintiff Robert Ross against the defendants.

origin, i.e., because plaintiffs are American, and thus violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the New York Human Rights Law, N.Y. Exec.Law § 290 *et seq.* ("Human Rights Law").

Dentsu has moved to dismiss the complaint against it pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") asserting that (1) this Court lacks personal jurisdiction over Dentsu under N.Y.Civ.Prac.L. & R. §§ 301, 302; (2) Dentsu is not plaintiffs' direct employer within the meaning of Title VII; (3) Dentsu does not employ fifteen people within the meaning of Title VII; (4) Dentsu is not engaged in an industry affecting commerce within the meaning of Title VII; (5) Dentsu is not an "employer" within the meaning of the Human Rights Law; (6) Plaintiffs' omission of Dentsu in the original EEOC complaint precludes Dentsu from being a defendant in this action; and (7) that Dentsu is entitled to prefer to employ in executive positions persons of Japanese national origin over Americans under Article VIII(1) of the Treaty of Friendship, Commerce, and Navigation between the United States and Japan ("FCN Treaty"). For the reasons stated below, we transform this motion into one for summary judgment and grant the motion for summary judgment in part and deny it in part.

## Background

Dentsu, a Japanese corporation, is the world's largest advertising and communications company.[2] Its headquarters and principal place of business are located in Tokyo, Japan. Dentsu maintains no office, place of business, or bank accounts in the United States. It also does not lease or own any real property in the United States.

DCA is Dentsu's wholly owned subsidiary and is incorporated in New York State. DCA, whose headquarters and principal place of business are also in New York, maintains separate payrolls, telephone numbers, offices, bank accounts, lines of credit, and accounting records from Dentsu. Dentsu has made no loans to DCA but has supplied it with at least $8 million in capital. Dentsu is, however, represented in DCA by a group of ten expatriate executives who work at DCA in the United States, but are natives and citizens of Japan. In some business contexts, these employees refer to themselves as "Dentsu employees," and Dentsu regulates many of the terms of their employment, including their compensation and when they may be fired. Expatriates comprise 7% of the DCA workforce, occupying three of the senior executive positions at DCA, including the two top offices of President and Executive Vice President/General Manager.

Dentsu approval is required for any major decision made by DCA and Dentsu approval is also needed in connection with the firing of any expatriate employee. Dentsu does not, however, have any control over the employment of non-expatriate employees. In addition, Dentsu assisted DCA with several "pitches" for accounts that were important to both firms. DCA's main clientele consists of American subsidiaries of Dentsu's Japanese clients. Sometimes the American clients of DCA send the fees for their accounts directly to Dentsu, which retains one third of the fees and forwards the remainder to DCA. On occasion, Dentsu, as opposed to DCA, has received direct payment for services rendered by DCA employees working on Dentsu's clients' accounts.

DCA fired plaintiffs in September 1990. In all, twenty-two American-born employees and one employee of Japanese national origin [3] were terminated in an action characterized by DCA as necessary to increase profitability of the company. It is undisputed that Dentsu did not order these specific employees to be fired and that Dentsu did not even know, until after the firings, who was actually let go. An American, Ray Freeman, DCA's Chief Operating Officer, actually created the plan for the discharges but the two top officers of DCA, Toshio Naito and Kiyoshi Eguchi, both expatriates, approved the

---

**2.** This statement of facts is based on the information contained in the affidavits submitted by both parties in support of and in opposition to this motion.

**3.** The employee of Japanese national origin that was fired, Mineko Muranaka, was not an expatriate executive, but she was a native of Japan.

changes. Dentsu mandated as a general rule, however, that none of DCA's expatriate employees could be fired until a job was found for them back in Japan. Plaintiffs assert that it was because of this policy that none of the expatriate executives employed at DCA were fired in September 1990.

On October 3, 1990, plaintiffs sent a letter to both DCA and Dentsu describing the potential discrimination claims that plaintiffs might file against Dentsu and DCA with the appropriate administrative agency, i.e., the Equal Employment Opportunity Commission ("EEOC"). The defendants' joint attorney responded to this letter by telling plaintiffs that any further action by plaintiffs in this matter should be addressed only to DCA, not Dentsu. On November 5, 1990, plaintiffs' filed their complaints against defendant DCA with the EEOC.[4] The EEOC did not attempt any conciliation efforts on behalf of the parties before the plaintiffs received their right-to-sue letters and took their grievances to the courts.

On May 24, 1991, plaintiffs filed suit in this Court against both DCA and Dentsu under Title VII and the Human Rights Law.

### Discussion

■■■ When the court is presented with materials outside the pleadings both in support of and in opposition to a 12(b)(6) motion, it is required to either exclude the additional materials and decide the motion solely based on the complaint, or to convert the motion to one for summary judgment under Fed. R.Civ.P. 56. *See Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988); *Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1971); *see generally* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1366 (1990 & Supp.1992) (discussing the proper circumstances in which a court may convert a motion to dismiss into a

motion for summary judgment). The court may convert the motion to dismiss into one for summary judgment after "all the parties [are] given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *In re G. & A. Books, Inc.,* 770 F.2d 288, 295 (2d Cir.1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986). Although under Fed.R.Civ.P. 56(c) a party must be given adequate notice and time to prepare its supporting materials, "the district court's conversion of a 12(b)(6) motion into one for summary judgment is governed by principles of substance rather than form." *Id.* A party cannot complain of lack of a reasonable opportunity to file relevant materials if both sides have already filed with the Court affidavits, depositions, or other evidence admissible at trial. *See id.; see also Nat'l Association of Pharmaceutical Mfrs., Inc. v. Ayerst Laboratories,* 850 F.2d 904, 911 (2d Cir.1988) (holding that when only the party moving to dismiss the complaint files supporting letters and affidavits, the opposing party must be deemed to have adequate notice that the motion to dismiss might be transformed into one for summary judgment).[5]

■■■ In the instant case, both parties have submitted several affidavits, depositions, and other documents to the Court in support of and in opposition to the motion to dismiss. The parties have also completed discovery and therefore have had a reasonable opportunity to present all relevant material to the Court. The parties cannot be surprised if the Court considers the materials they themselves have both submitted. The Court therefore elects to convert this motion to dismiss into a motion for summary judgment.

On a motion for summary judgment, the Court must determine whether there are any genuine issues of material fact. *See* Fed. R.Civ.P. 56; *Donohue v. Windsor Locks Bd. of Fire Commissioners,* 834 F.2d 54, 57 (2d

---

4. Filicia filed his EEOC complaint a few months after the other plaintiffs filed their EEOC complaints. When Filicia received his right-to-sue letter, he filed a separate lawsuit in this Court. This Court then consolidated Filicia's legal action with the other plaintiffs' action on April 10, 1992.

5. Some courts have also held that a motion to dismiss cannot be converted into one for summary judgment before discovery has been completed. *See Melo v. Hafer,* 912 F.2d 628, 634 (3rd Cir.1990), *aff'd,* — U.S. —, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Brug v. Enstar Group, Inc.,* 755 F.Supp. 1247, 1251 (D.Del. 1991).

Cir.1987). The court must construe the record in the light most favorable to the non-moving party. *Id.* If no reasonable trier of fact could find for the non-moving party, then the court may grant a motion for summary judgment. *See Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991).

### A. This Court has Personal Jurisdiction Over Dentsu.

When the parties in a case have conducted discovery and there remain no disputed issues of fact with respect to the issue of personal jurisdiction, the court must determine whether personal jurisdiction exists as a matter of law. *See Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990).

In this case, the parties have already conducted discovery and have submitted affidavits with factual support for their relative positions. The 12(b)(2) motion filed by the defendant Dentsu does not contest any of the plaintiffs' facts relevant to the question of our personal jurisdiction over Dentsu.[6]

■ When subject matter jurisdiction is based on a question of federal law and the federal statute does not provide for national service of process, courts must look to the forum state's long-arm statute to determine if the defendant is amenable to service of process, a prerequisite of personal jurisdiction. *Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 108, 108 S.Ct. 404, 411, 98 L.Ed.2d 415 (1987); *see also Canterbury Belts, Ltd. v. Lane Walker Rudkin, Ltd.,* 869 F.2d 34, 40 (2d Cir.1989) (stating that courts must look to the law of the forum state to determine if they may exercise personal jurisdiction over defendants in cases where the subject matter jurisdiction is based on a federal statute with no provision for national service of process). In this action, since Title VII does not provide for national service of process, we must look to the requirements of the New York long-arm statute in order to determine if we have personal jurisdiction over Dentsu.

Plaintiffs have set forth several theories under both N.Y.Civ.Prac.L. & R. §§ 301 and 302 under which the court may seek to exercise personal jurisdiction over Dentsu in this case. Since the Court finds personal jurisdiction for defendant Dentsu under N.Y.Civ. Prac.L. & R. § 301 ("§ 301"), we need not consider our jurisdiction under N.Y.Civ. Prac.L. & R. § 302.

■ Under § 301, a defendant is subject to personal jurisdiction if it is "doing business" in New York, even if the business activities are unrelated to the cause of action. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57–58 (2d Cir.1985). In order to ascertain whether the defendant is "doing business" in New York, the Court must determine if the defendant has had "continuous and systematic" contacts with New York. *Frummer v. Hilton Hotels Int'l,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 43, 227 N.E.2d 851 (Ct.App.), *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967). The New York Courts have called for this analysis to be a "simple and pragmatic one." *Bryant v. Finnish National Airline,* 15 N.Y.2d 426, 260 N.Y.S.2d 625, 628–29, 208 N.E.2d 439, 442–43 (Ct.App.1965). The Court must consider all of the facts of the case, keeping in mind that no one fact is dispositive. *See Palmieri v. Estefan,* 793 F.Supp. 1182, 1187 (S.D.N.Y.1992); *Heller & Co., Inc. v. Novacor Chemicals Ltd.,* 726 F.Supp. 49, 52 (S.D.N.Y.1988), *aff'd,* 875 F.2d 856 (2d Cir. 1989).

■ In this case, plaintiffs have not argued that Dentsu itself has had substantial contacts with New York. However, plaintiffs maintain that we may exercise personal jurisdiction over Dentsu because of Dentsu's significant relationship with an entity that is present in New York, namely DCA.[7] It is well settled that personal jurisdiction may be asserted over a foreign corporation with a subsidiary in New York if the relationship between the two gives rise to a "valid inference of an agency relationship." *Estefan,* 793 F.Supp. at 1187; *see Saraceno v. S.C.*

---

6. These specific facts will be detailed *infra.*

7. Neither party disputes the fact that this Court has personal jurisdiction over DCA.

*Johnson & Son, Inc.,* 83 F.R.D. 65, 67 (S.D.N.Y.1979). The presence of a subsidiary in New York alone, however, is not sufficient under this test to grant personal jurisdiction over the parent corporation. *Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd.,* 508 F.Supp. 1322, 1334 (E.D.N.Y.1981).

■ A court has personal jurisdiction over a foreign parent corporation with a New York based subsidiary when "[the] New York representative provides services beyond 'mere solicitation' and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116, 121 (2d Cir.1967) (exercising personal jurisdiction under the "agency theory" over a foreign tour group by way of its independent New York booking and ticketing representative), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968); *see Frummer,* 281 N.Y.S.2d at 44. In addition, the common ownership of two corporations may "give rise to a valid inference as to the broad scope of the agency." *Frummer,* 281 N.Y.S.2d at 45. Other factors a court must consider in determining whether there is personal jurisdiction over a foreign parent corporation by way of its subsidiary is the importance of the New York market to the foreign corporation and whether the subsidiary informs the parent of all activities of the subsidiary that may have an impact on the New York market. *See Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd.,* 508 F.Supp. at 1344.

In the case before us, it is undisputed that DCA does enough business in New York so that it is doing more than "merely soliciting" business in New York. Since most of DCA's clients are American subsidiaries of Dentsu's Japanese clients, DCA creates advertising for its own clients in New York always with the intent to bolster relations between the two Japanese parent corporations. Moreover, DCA has on occasion serviced Dentsu clients in New York, specifically with the Sumitomo Dunlop account. Finally, in other instances, such as the Sumitomo Trust & Banking account, DCA has attracted and serviced new American clients with the specific intent to gain the business of the Japanese parent corporation for Dentsu. DCA is constantly attracting and servicing business in New York for Dentsu.

Furthermore, we believe that DCA is doing all of the business that Dentsu would do were Dentsu in New York. Dentsu is the world's largest communications corporation and because it holds itself out as such, we believe that it prides itself on its international status.[8] Dentsu owns 100% of the stock in DCA, giving rise to the requisite broad inference of agency. In addition, the fact the DCA's name recently changed to "Dentsu Corporation of America" in order to highlight DCA's connection to the parent corporation demonstrates Dentsu's desire to maintain the major global advertising market share that it has today. *See* Freeman Deposition at p. 6, Exhibit F to Raskin Affidavit. Moreover, Dentsu keeps a careful eye on DCA through the expatriate employees and the monthly financial reports DCA sends to Japan. *See* Naito Deposition at pp. 100–01, Exhibit A to Raskin Affidavit. Regardless of how profitable DCA may or may not be, we believe that Dentsu, as a worldwide entity, would certainly find some way to operate in New York were DCA not doing business there already. Accordingly, we find that DCA is an agent of Dentsu and that we may exercise personal jurisdiction over Dentsu.

Citing *Tokyo Boeki (U.S.A.), Inc. v. S.S. Navarino,* 324 F.Supp. 361 (S.D.N.Y.1971) and *Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd.,* 508 F.Supp. 1322 (E.D.N.Y.1981), Dentsu maintains that the only circumstances where personal jurisdiction may be exercised over a foreign parent corporation under the agency theory are those which involve a foreign manufacturing company that wholly owns a New York distributor. Dentsu argues that because DCA creates its own advertising and does not market products created by Dentsu, DCA cannot be con-

---

**8.** *See* Dentsu 1990 Data Book (describing Dentsu's primary corporate objective as "open[ing] new opportunities in communications ... wher-ever they exist" and characterizing Dentsu's corporate symbol as a focus for the "pursuit of excellence in global communications.")

sidered Dentsu's agent. Therefore, Dentsu claims that it is not doing business in New York within the meaning of § 301.

We disagree. While some of the cases find personal jurisdiction over a foreign parent corporation under the agency theory involve the specific situation of a foreign manufacturer and its American distributor, we believe that a court may exercise personal jurisdiction over a parent where the agent simply provides general "services sufficiently important to the foreign corporation." *See Gelfand*, 385 F.2d at 121; *see also Estefan*, 793 F.Supp. at 1190–94 (exercising jurisdiction under the agency test where both the American company and its foreign affiliates created musical talent and sold the rights to such musical talent to each other).

Therefore, we find, for the purposes of personal jurisdiction, that Dentsu would do all of the New York business that DCA does if DCA were not present in New York, and we hold that Dentsu is subject to personal jurisdiction in New York through its agent, DCA.[9]

### B. Dentsu is Plaintiffs' Employer Within the Meaning of Title VII.

█ Dentsu claims that it was not plaintiffs' employer within the meaning of Title VII. The Second Circuit has found that the term " 'employer' ... is sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an 'employer' of an aggrieved individual as that term has generally been defined at common law." *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1063 (2d Cir.1982) (quoting *Vanguard Justice Society, Inc. v. Hughes*, 471 F.Supp. 670, 696 (D.Md.1979)), *vacated and remanded on other grounds*, 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406, 463 U.S. 1223, 103 S.Ct. 3566, 77 L.Ed.2d 1406 (1983); *accord People of the State of New York v. Holiday Inns, Inc.*, 1993 WL 30933, 5–11 (W.D.N.Y.1993) (holding that a third party parent corporation who interferes with its subsidiary's employment policies

may be considered an employer within the meaning of Title VII); *see also United States v. Yonkers*, 592 F.Supp. 570, 589–92 (S.D.N.Y.1984) (finding that the State of New York was an "employer" under Title VII because the state provided the direct employer with discriminatory exams which determined in part which employees were hired by the direct employer). "[A] party must [ ] exercise[ ] a direct and significant degree of control over the complaining party's direct employer or the complaining party's 'work environment' " to be considered an employer within the meaning of Title VII. *Holiday Inns*, 1993 WL 30933 at 6.

In *Spirt*, the administrator of Long Island University's retirement benefits plan was using discriminatory actuarial tables. *Spirt*, 691 F.2d at 1062–63. All tenured faculty members at the university were required to participate in this plan. *Id.* at 1057. The plan's administrator, an outside third party, was found to be an "employer" under Title VII because it significantly affected the terms of the tenured faculty members' employment. *Spirt*, 691 F.2d at 1063; *see also Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338, 1342 (D.C.Cir.1973) (finding a third party hospital to be an "employer" under Title VII because the hospital controlled the plaintiff nurse's access to his private patients).

In the instant case, the plaintiffs have shown that Dentsu significantly affected the subsidiary's employment policies. Dentsu explicitly ordered DCA not to fire any Dentsu expatriates. Moreover, Dentsu regulated the terms of the expatriates' employment. Although Dentsu maintained that it had no specific involvement with the plaintiffs' terminations, the expatriate policy that Dentsu dictated had an impact on all DCA employees because it affected who was to be fired in the downsizing at DCA. We believe that this general labor policy, which Dentsu imposed on DCA, creates an adequate nexus by which the Court may hold Dentsu to be an employer for purposes of Title VII.

---

**9.** We observe that Dentsu has another wholly owned subsidiary in New York called Dentsu NY. As there has been no discussion by the parties as to Dentsu NY's specific activities, we decline to consider its presence in New York for purposes of this motion.

## C. Dentsu Employs Fifteen People Within the Meaning of Title VII.

■ Defendant Dentsu also asserts that it is not an "employer" within the meaning of Title VII because it does not employ more than fifteen people in the United States. The term "employer" is defined under Title VII, § 2000e(b) as follows:

... a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year ...

While it is clear that Dentsu does not have any employees of its own within the United States under the common law interpretation of the word "employee," the Court finds that fact to be irrelevant given the nature of Dentsu's control over DCA's firing policies.

In *Spirt*, discussed *supra*, the court found that the retirement benefits plan administrator could be considered an employer under Title VII. *Spirt*, 691 F.2d at 1063. In that case, the victims of discrimination were the direct employees of the university, not those paid by the administrator. Nevertheless, the Second Circuit implicitly decided that because the administrator interfered with the professors' employment, the administrator was an employer of those professors within the meaning of Title VII.[10] The only logical "employees" for the court to have considered when determining whether the administrator employed more than fifteen employees were the persons whom the administrator's policy affected, i.e. the professors.[11]

In the instant case, the obvious employees we must count to determine whether Dentsu has more than fifteen employees for the purposes of Title VII are the DCA employees located in New York. They are the people who can or cannot be fired according to Dentsu's policy. It would be illogical to determine that Dentsu was an employer to these plaintiffs because it interfered with DCA's labor policies and then count the number of people Dentsu has, in the traditional sense, "employed" in the United States. The direct employees of the parent corporation are not the ones who are the alleged victims of discrimination, rather the 144 DCA employees are the people affected by Dentsu's policy.[12] Accordingly, because Dentsu's policy affected more than fifteen employees in the United States, we find that Dentsu employed fifteen employees within the meaning of Title VII.

## D. Dentsu is Engaged in an Industry Affecting Commerce Within the Meaning of Title VII.

■ Dentsu claims that it is not engaged in an industry affecting commerce and is not conducting any trade with the United States within the meaning of Title VII. Under 42 U.S.C. § 2000e(g), the term "commerce" means "trade, traffic, commerce, transportation, transmission, or communication among the several states, between a State and a place outside thereof ..." As for affecting commerce, the courts have explicitly stated that Title VII applies to foreign corporations to the extent that they employ people and discriminate against them within the United States. *See EEOC v. Kloster Cruise Ltd.*, 743 F.Supp. 856, 858 (S.D.Fla.1990), *rev'd on other grounds*, 939 F.2d 920 (11th Cir.1991); *Ward v. W & H Voortman, Ltd.*, 685 F.Supp. 231, 232 (M.D.Ala.1988).

In the instant case, we find Dentsu's claim that it is not affecting commerce in the Unit-

---

10. For example, the court states: "[the administrator] ... exist[s] solely for the purpose of enabling universities to delegate their responsibility to provide retirement benefits for their employees ..." *Spirt*, 691 F.2d at 1063.

11. The court in *Spirt* does state that more than 400,000 employees at 2800 colleges and universities were participants in this retirement benefits plan *Spirt*, 691 F.2d at 1057. Significantly, the court does not mention how many people the plan administrator has employed as the term "employed" is commonly understood.

12. We recognize that in *People of the State of New York v. Holiday Inns, Inc.*, the district judge appeared to be counting the number of employees in the parent corporation rather than counting the number of employees affected by the Holiday Inns policy, i.e. the employees of the franchisees. As apparent from above, we believe that the proper employees to count are the potential victims of discrimination. Therefore, this Court respectfully disagrees with the *Holiday* court's approach to counting employees for the purposes of Title VII.

ed States to be meritless. Dentsu has directly invested $8 million in DCA and has been sharing in some of DCA's payments from DCA's clients. Dentsu also receives monthly reports from DCA. In addition, the Court has already determined that Dentsu is an "employer" of workers in the United States and has been interfering with DCA's American labor policies. In sum, given that Dentsu has such a large business involvement in the United States and is considered to be an employer of these plaintiffs within the meaning of Title VII, we are satisfied that Dentsu is engaged in an industry affecting commerce for the purposes of Title VII.[13]

### E. Dentsu is not an Employer Within the Meaning of the Human Rights Law.

■ Dentsu asserts that it is not plaintiffs' employer within the meaning of the Human Rights Law and that therefore the Human Rights Law claim against it must be dismissed. We agree. In determining whether an entity may be considered an employer within the meaning of the Human Rights Law, the Court must analyze four elements: 1) whether the proposed employer had the power of the selection and engagement of the employee; 2) whether the proposed employer made the payment of salary or wages to the employee; 3) whether the proposed employer had the power of dismissal over the employee; and 4) whether the proposed employer had the power to control the employee's conduct. *State Division of Human Rights v. GTE Corp.*, 109 A.D.2d 1082, 487 N.Y.S.2d 234, 235 (A.D. 4th Dept. 1985). Courts have held that the most essential factor in this analysis is the fourth one,

namely whether the employer had control over the employee's conduct. *See In re Villa Maria Institute of Music v. Ross*, 54 N.Y.2d 691, 442 N.Y.S.2d 972, 973, 426 N.E.2d 466 (Ct.App.1981); *see also Gemakian v. Kenny Int'l Corp.*, 151 A.D.2d 342, 543 N.Y.S.2d 66, 67 (1st Dept.1989) (holding that the employer's control over the employee's conduct is the essential element in finding an employer-employee relationship for the purposes of the Human Rights Law).

■ In applying the test described above to this case, we find that Dentsu is not an employer of the plaintiffs for purposes of the Human Rights Law. First, Dentsu only had the power of selection of employees over a few people—the expatriates. Dentsu had no control, however, over who was hired to fill the remaining 93% of the positions at DCA.

Moreover, DCA, not Dentsu, paid all of its employees' salaries. Dentsu did directly subsidize the expatritates' salaries and provided them extra benefits.[14] However, these benefits did not comprise the entire compensation of the expatriate employees and Dentsu paid no part of the salaries of the other 134 people working for DCA.

In addition, Dentsu could not fire any DCA employee despite Dentsu's power to veto a dismissal of an expatriate employee. While this constitutes some involvement with the dismissal process, we believe that Dentsu's power in this area is not substantive enough to constitute a general power of dismissal over the entire workforce of DCA.

Finally, Dentsu had little or no involvement with the day-to-day control over the conduct of DCA's employees. DCA consulted the parent corporation only for major

---

**13.** Defendant Dentsu cites *McCulloch v. Sociedad Nacional*, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1962) as evidence that foreign commerce is not included under Title VII. This case, concerning the National Labor Relations Act, set up a balancing test to determine whether labor laws of the United States could be applied to labor practices aboard a foreign owned vessel that occasionally docked in the United States. The court was therefore dealing with labor activities occurring in both foreign and domestic waters. Given the potential international ramifications for applicability of these laws when the vessel in question did not spend most of its time in the United States, the court concluded that the labor

laws were not applicable. *See id.* at 19–21, 83 S.Ct. at 676–77. Since the relevant acts in this case occurred well within the borders of the United States, we believe that *McCulloch* is not relevant to the case before us. Similarly, Dentsu's reliance on *EEOC v. Arabian Oil Co.*, 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) *is also misplaced because in that case the alleged* Title VII violations occurred entirely outside of the United States.

**14.** Specifically, they paid part of the expatriates' annual bonuses and gave them tax reimbursements on their DCA-paid salaries.

decisions. As noted above, control of the employee's conduct is the most important factor for determining whether a defendant is an employer within the meaning of the Human Rights Law. After weighing all of the relevant factors, we conclude that Dentsu cannot be considered an employer within the meaning of the Human Rights Law.[15]

Plaintiffs apparently contend that because Dentsu is considered an employer within the meaning of Title VII, this Court must consider it to be an employer under the Human Rights Law. Plaintiffs have pointed to and we have found no cases that hold that the New York Court have decided to interpret the term "employer" as broadly as have the federal courts.[16] Since the New York courts have apparently not chosen to follow the federal standard, we accordingly grant Dentsu's motion for summary judgment as to the Human Rights Law claim.

### F. Plaintiffs' Omission of Dentsu on the EEOC Complaint Does Not Preclude Dentsu From Being a Defendant in this Action.

■ Dentsu claims that it cannot be sued in federal court because plaintiffs did not name Dentsu as a defendant in plaintiffs' EEOC complaint. In order to bring a civil action in federal court under Title VII, one must have filed a complaint with the EEOC. *Johnson v. Palma*, 931 F.2d 203, 209 (2d Cir.1991). As a general rule, one may only sue in federal court under Title VII a party listed as a defendant on such a complaint. *See* 42 U.S.C. § 2000e–5(f)(1); *Johnson*, 931 F.2d at 209. This rule ensures that defendants have adequate notice of potential claims and allows them to make early reparations without the expense of litigation. The Second Circuit has, however, made exceptions to this rule.

In *Johnson v. Palma*, the Second Circuit held that if a party unnamed on the EEOC complaint has an "identity of interest" with a party named on the EEOC complaint, the unnamed party may be sued under Title VII. *Johnson*, 931 F.2d at 209; *see Glus v. G.C. Murphy & Co.*, 562 F.2d 880, 888 (3d Cir. 1977). Courts have allowed this "identity of interest" exception because it is important to maintain "the availability of complete redress of legitimate grievances without undue encumbrance by procedural requirements ..." *Id.* In order to determine if an identity of interest between the parties exists, the court must consider four factors:

1) whether the role of the unnamed party could through reasonable efforts by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of the named [party] are so similar as the unnamed party's that for purposes of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; and 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

---

**15.** Dentsu also asserts that it cannot be vicariously liable for violations of the Human Rights Law committed by its subsidiary, DCA. We agree. Under New York law, a parent corporation is not liable for the violations of the Human Rights Law committed by the subsidiary unless the subsidiary has no real corporate independence. *Horowitz v. Aetna Life Insurance*, 148 A.D.2d 584, 539 N.Y.S.2d 50, 53 (2nd Dept. 1989). Since the plaintiffs have not submitted any evidence to support the contention that the corporate relationship between Dentsu and DCA is a sham, we find that Dentsu may not be held liable under the Human Rights Law for the actions of its subsidiary.

**16.** Plaintiffs' reliance on *Pace College v. Comm'n on Human Rights*, 38 N.Y.2d 28, 377 N.Y.S.2d 471, 479, 339 N.E.2d 880, 888 (Ct.App.1975) to support the assertion that we must interpret the term "employer" as broadly under the Human Rights Law as we do under Title VII is misplaced. *Pace* involved an alleged violation of the New York City Administrative Code. *Id.*, 377 N.Y.S.2d at 474, 339 N.E.2d at 883. This provision is "comparable in effect" to the Human Rights Law. *Id.* at 476, 339 N.E.2d at 885. In *Pace*, the court cites a Supreme Court decision in passing on a matter totally unrelated to any issues at hand and nowhere asserts that it is interpreting the term "employer" according to federal law. Therefore, we find plaintiffs' claim that New York courts look to federal interpretation of Title VII for guidance on the definition of an "employer" to be meritless.

*Johnson v. Palma,* 931 F.2d at 209–10 (quoting *Glus,* 562 F.2d at 888). This test is "not a mechanical one . . . and no single factors is decisive." *Glus v. G.C. Murphy & Co.,* 629 F.2d 248, 251 (3d Cir.1980), *vacated on other grounds,* 451 U.S. 935, 101 S.Ct. 2013, 68 L.Ed.2d 321 (1981).

As to the first factor, given that the plaintiffs addressed their initial letter complaining of discrimination to both Dentsu and DCA, the plaintiffs appear to have had some knowledge at the time plaintiffs filed their administrative complaint of Dentsu's role in DCA's allegedly discriminatory activities. However, plaintiffs were apparently dissuaded from naming Dentsu in their EEOC complaint by Dentsu's attorney.

As far as the second factor is concerned, it is not disputed that the interests of DCA and Dentsu in this matter are identical, and that had there been any conciliatory efforts made by the EEOC, it would have been redundant for Dentsu to have had its own representative at the negotiations. Dentsu demonstrated its strong interest in its subsidiary through the expatriate employees and its interference with DCA's labor policies. In addition, Dentsu and DCA have always been represented by the same legal counsel and by definition Dentsu had adequate notice and representation in the EEOC proceedings. *See Kelber v. Forest Elec. Corp.,* 799 F.Supp. 326, 331 n. 4 (S.D.N.Y.1992) (holding that because a parent corporation and its subsidiary shared a legal department, the unnamed parent corporation had adequate notice of its liability under Title VII when the parent corporation and the subsidiary were sued in federal court). Given their joint legal counsel and various other connections, the Court believes that Dentsu and DCA share an identity of interest with respect to these proceedings.[17]

As to the third consideration, since the EEOC took no action, Dentsu did not suffer any actual prejudice. *See Koster v. Chase Manhattan Bank,* 554 F.Supp. 285, 289 (S.D.N.Y.1983) (holding that a defendant not named in the EEOC complaint could not have suffered any actual prejudice because the EEOC had made no conciliatory efforts on behalf of the parties).

The fourth factor also persuades us that plaintiffs should be able to sue Dentsu in this Title VII action because Dentsu made a representation to plaintiffs that the relationship in this action should be with DCA. Prior to any administrative or legal actions, plaintiffs wrote to both Dentsu and DCA on October 3, 1990 concerning the September 1990 firings. Joint counsel for both defendants responded that plaintiffs were mistaken in addressing any inquiries to the parent company. While we are not prepared to characterize these misleading statements as intentional on the part of the defendant Dentsu, they appear to have had the unfortunate effect of dissuading the plaintiffs from naming a key party in this action, i.e. Dentsu, in the original EEOC complaint. While the defendants make much of what the plaintiffs may or may not have learned about Dentsu in the time between the filing of the EEOC complaint and the filing of this action in this Court, these facts are not really relevant to our inquiry. What is important is that Dentsu did receive adequate notice of these charges and suffered no actual prejudice as a result of the plaintiffs not naming Dentsu in the EEOC complaint. For the purposes of this action, we are satisfied that DCA and Dentsu share an identity of interest.

Accordingly, we hold that plaintiffs' Title VII claim against defendant Dentsu is not

---

**17.** In *Johnson v. Palma,* the plaintiff's claim against the International Union of Electric, Radio, and Machine Workers ("IUE") failed because the union was not named on the EEOC complaint along with the IUE Local 509. *Johnson,* 931 F.2d at 209–211. Under the second criteria set out above, the plaintiff's claim failed in part because there was a specific grievance procedure written into the collective bargaining agreement that directed all such complaints to be handled through the local union. *Id.* Under those circumstances, the international union therefore had no actual notice of the plaintiff's complaint. *Id.* The specific direction of the grievance process also precluded any identity of interest between the two union divisions.

In the instant case, there was no such specific grievance procedure to handle employment disputes involving both Dentsu and DCA. The Court believes therefore that the close corporate relationship between the two entities gives rise to an adequate identity of interest.

dismissed because plaintiffs did not name Dentsu on the EEOC complaint.

## G. The FCN Treaty Does Not Give Dentsu the Right to Discriminate Based on National Origin.

Dentsu asserts that even if it discriminated against the plaintiffs based on their national origin, Dentsu is not liable for violations of Title VII. Dentsu claims that as a Japanese corporation, the FCN Treaty allows Dentsu to discriminate on the basis of national origin. Article VIII(1) of this treaty, signed April 2, 1953, authorizes "companies of either party to engage, in the territories of the other party, accountants and other technical experts, executive personnel, attorneys, agents and other specialists of their choice." 4 U.S.T. 2063.

■■■ A Japanese corporation doing business in the United States can only hire according to national origin if the company can show that national origin is a bona fide occupational qualification. *See Avigliano v. Sumitomo Shoji America, Inc.,* 638 F.2d 552, 559 (2d Cir.1981), *rev'd and remanded on other grounds,* 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982). Although this exception is generally read in a narrow fashion for domestic Title VII defendants, the Second Circuit has determined that "as applied to a Japanese company enjoying rights under Article VIII of the [FCN] Treaty, [this exception to Title VII] must be construed in a manner that will given due weight to the Treaty rights ..." *Avigliano,* 638 F.2d at 559.[18] In order to accommodate the foreign employer's treaty rights, the court must consider whether or not a position requires the following four factors:

1) Japanese linguistic and cultural skills; 2) knowledge of Japanese products, markets, customs, and business practices; 3) familiarity with ... the parent enterprise in Japan; and 4) acceptability to those with whom the company ... does business. *Id.* Under this test, the Japanese company has the burden of proving bona fide occupational qualification. *Id.*

■■■ In the case before us, Dentsu has presented no evidence that national origin is a bona fide occupational requirement of the jobs from which the plaintiffs were fired.[19] Moreover, from reviewing the job requirements for positions from which plaintiffs were fired, it is clear that none of these special skills are required of people hired in these positions at DCA.[20] Given the lack of evidence that Japanese national origin is a bona fide occupational qualification for the jobs from which plaintiffs were fired, Dentsu is not shielded by the FCN Treaty from the reach of Title VII. Accordingly, Dentsu's motion for summary judgment on the Title VII claim is denied.

### Conclusion

For the reasons stated above, we grant Dentsu's motion for summary judgment as to the plaintiffs' Human Rights Law claim and deny Dentsu's motion for summary judgment as to plaintiffs' Title VII claim.

SO ORDERED.

**18.** Other than to allow increased flexibility in reading this exception to Title VII, the FCN Treaty does not give Japanese corporations any increased privilege to discriminate on the basis of national origin.

**19.** It is only logical that the bona fide occupational qualifications be analyzed in terms of what would be expected of a typical DCA employee in the positions from which the plaintiffs were fired. It is these employees in the United States who have allegedly suffered discrimination as a result of Dentsu's interference with DCA's employment policies.

**20.** The documents which describe the qualifications for the jobs from which plaintiffs were fired were submitted in conjunction with defendant DCA's motion for summary judgment. The various qualifications include a certain number of years of experience in advertising, educational degrees, and various managerial, organizational, and creative skills. Although the requirements differ with each position, no job from which a plaintiff was fired required any of the four skills enumerated in the *Avigliano* standard for a bona fide occupational qualification.